**DR. SEUSS ENTERPRISES, L.P., Plaintiff–Appellee,**

v.

**PENGUIN BOOKS USA, INC., a corporation; Dove Audio, Inc., a corporation, Defendants–Appellants.**

**No. 96–55619.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 10, 1996.

Decided March 27, 1997.

**1396**

Vincent Cox, Leopold, Petrich & Smith, Los Angeles, California, for defendants-appellants.

Alexander H. Rogers and Cathy Ann Bencivengo, Gray Cary Ware & Freidenrich, San Diego, California, for plaintiff-appellee.

Before O'SCANNLAIN, T.G. NELSON, and HAWKINS, Circuit Judges.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether a poetic account of the O.J. Simpson double murder trial entitled *The Cat NOT in the Hat! A Parody by Dr. Juice*, presents a sufficient showing of copyright and trademark infringement of the well-known *The Cat in the Hat* by Dr. Seuss.

### I

Penguin Books USA, Inc. ("Penguin") and Dove Audio, Inc. ("Dove") interlocutorily appeal the district court's preliminary injunction prohibiting the publication and distribution of *The Cat NOT in the Hat! A Parody by Dr. Juice*, a rhyming summary of highlights from the O.J. Simpson double murder trial, as violating copyrights and trademarks owned by Dr. Seuss Enterprises, L.P. ("Seuss"), particularly from the book *The Cat in the Hat*.

Seuss, a California limited partnership, owns most of the copyrights and trademarks to the works of the late Theodor S. Geisel, the author and illustrator of the famous children's educational books written under the pseudonym "Dr. Seuss." Between 1931 and 1991, Geisel wrote, illustrated and published at least 47 books that resulted in approximately 35 million copies currently in print worldwide. He authored and illustrated the books in simple, rhyming, repetitive language, accompanied by characters that are recognizable by and appealing to children. The characters are often animals with human-like characteristics.

In *The Cat in the Hat*, first published in 1957, Geisel created a mischievous but well meaning character, the Cat, who continues to be among the most famous and well recognized of the Dr. Seuss creations. The Cat is almost always depicted with his distinctive scrunched and somewhat shabby red and white stove-pipe hat. Seuss owns the common law trademark rights to the words "Dr. Seuss" and "Cat in the Hat," as well as the character illustration of the Cat's stove-pipe hat. Seuss also owns the copyright registrations for the books *The Cat in the Hat, The Cat in the Hat Comes Back, The Cat in the Hat Beginner Book Dictionary, The Cat in the Hat Songbook*, and *The Cat's Quizzer*. In addition, Seuss has trademark registrations for the marks currently pending with the United States Trademark Office. Seuss has licensed the Dr. Seuss marks, including *The Cat in the Hat* character, for use on clothing, in interactive software, and in a theme park.

In 1995, Alan Katz and Chris Wrinn, respectively, wrote and illustrated *The Cat NOT in the Hat!* satirizing the O.J. Simpson double murder trial. Penguin and Dove, the publishers and distributors, were not licensed or authorized to use any of the works, characters or illustrations owned by Seuss. They also did not seek permission from Seuss to use these properties.

Seuss filed a complaint for copyright and trademark infringement, an application for a temporary restraining order and a preliminary injunction[1] after seeing an advertise-

---

**1.** "To obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibili-ty of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. These formulations are not

ment promoting *The Cat NOT in the Hat!* prior to its publication. The advertisement declared:

Wickedly clever author "Dr. Juice" gives the O.J. Simpson trial a very fresh new look. From Brentwood to the Los Angeles County Courthouse to Marcia Clark and the Dream Team. *The Cat Not in the Hat* tells the whole story in rhyming verse and sketches as witty as Theodore [sic] Geisel's best. This is one parody that really packs a punch!

Seuss alleged that *The Cat NOT in the Hat!* misappropriated substantial protected elements of its copyrighted works, used six unregistered and one registered Seuss trademarks, and diluted the distinctive quality of its famous marks. Katz subsequently filed a declaration stating that *The Cat in the Hat* was the "object for [his] parody" and portions of his book derive from *The Cat in the Hat* only as "necessary to conjure up the original."

Seuss filed suit under the enforcement provisions of the Copyright Code, 17 U.S.C. §§ 501–02; the Lanham Act, 15 U.S.C. § 1125(a); the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c)(1); and the California Unfair Competition Statute, § 17200 *et seq.* and § 14330. The district court denied the request for the temporary restraining order, but it set a hearing date for the preliminary injunction. Penguin and Dove went forward with the production schedule. Seuss incorporated additional infringement claims from other Dr. Seuss texts-*Horton Hatches the Egg* and *One Fish Two Fish Red Fish Blue Fish*-in its request for injunctive relief. On March 21, 1996, the district court granted Seuss' request for a preliminary injunction. About 12,000 books, at an expense of approximately $35,500, had been printed to date but now were enjoined from distribution. Penguin and Dove

brought a motion for reconsideration and Katz filed a second declaration admitting to drawing from the other two Dr. Seuss works. Seuss then withdrew its claim regarding an illustration from *Horton* for purposes of its motion for injunctive relief.

■ While the district court modified its order in reconsidering these new claims, it did not dissolve the preliminary injunction. The court found that Seuss had demonstrated: (1) a strong likelihood that Katz and Wrinn had taken substantial protected expression from *The Cat in the Hat* but not from *Horton* or *One Fish Two Fish*; (2) a strong likelihood of success on the copyright claim raising a presumption of irreparable harm; (3) a strong likelihood of success on the parody as fair use issue; (4) serious questions for litigation and a balance of hardships favoring Seuss on the trademark violations; and (5) a minimal likelihood of success on the federal dilution claim. Penguin and Dove timely appealed.[2]

## II

We must first determine whether *The Cat NOT in the Hat!* infringes on Seuss' rights under the Copyright Act of 1976, 17 U.S.C. § 106. Seuss, as the owner of the Dr. Seuss copyrights, owns the exclusive rights (1) to reproduce the copyrighted work; (2) to prepare derivative works based on the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public; (4) to perform the work publicly; and (5) to display the copyrighted work publicly. § 106. Seuss alleges that Penguin and Dove made an unauthorized derivative work of the copyrighted works *The Cat in the Hat, The Cat in the Hat Comes Back, The Cat's Quizzer, The Cat in the Hat Beginner Books Dictionary,* and *The Cat in the Hat's Song Book* in violation of §§ 106 and 501.

---

different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases. Under either formulation, the moving party must demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury." *Big Country Foods, Inc. v. Board of Educ.,* 868 F.2d 1085, 1088 (9th Cir.1989) (internal citations omitted).

**2.** Under the applicable standard of review, we may reverse the grant of the preliminary injunction only if the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *See Does 1–5 v. Chandler,* 83 F.3d 1150, 1152 (9th Cir.1996); *Miller v. California Pac. Med. Ctr.,* 19 F.3d 449, 455 (9th Cir.1994) (en banc).

To prove a case of copyright infringement, Seuss must prove both ownership of a valid copyright and infringement of that copyright by invasion of one of the five exclusive rights. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1472 (9th Cir.) *cert. denied*, 506 U.S. 869, 113 S.Ct. 198, 121 L.Ed.2d 141 (1992). First, Seuss is the owner of the Dr. Seuss copyrights and holds valid copyright registration certificates. Second, Katz admitted that the "style of the illustrations and lettering used in [*The Cat NOT in the Hat!*] were inspired by [*The Cat in the Hat*]. ..." To satisfy the infringement test, Seuss must demonstrate "substantial similarity" between the copyrighted work and the allegedly infringing work. "Substantial similarity" refers to similarity of expression, not merely similarity of ideas or concepts. *See* 17 U.S.C. § 102(b).

 Most courts have used some form of bifurcated test to demonstrate "substantial similarity," inquiring first if there is copying and second if an audience of reasonable persons will perceive substantial similarities between the accused work and protected expression of the copyrighted work. This court's two-part test for substantial similarity finds its roots in *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.1977). In *Krofft*, the first question is labeled the "extrinsic" test and asks if there is similarity of ideas. "Analytic dissection" is allowed.[3] The second *Krofft* question is labeled the "intrinsic" test and asks if an "ordinary reasonable person" would perceive a substantial taking of protected expression. At this stage, "analytical dissection" is not appropriate. The *Krofft* formulation has been criticized by certain

leading commentators. *See* 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.03[E][3] (rev. ed.1996). Penguin and Dove rely on those criticisms to make their case against the copyright infringement claims.[4] We have recently modified the *Krofft* test, bringing it more in line with the test followed in other circuits. *See, e.g., Apple Computer Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442–43 (9th Cir.1994) ("As it has evolved, however, the extrinsic test now objectively considers whether there are substantial similarities in both ideas and expression, whereas the intrinsic test continues to measure expression subjectively.... [W]e use analytic dissection to determine the scope of copyright protection before works are considered 'as a whole.'") (citation omitted); *Shaw v. Lindheim*, 919 F.2d 1353, 1357 (9th Cir.1990) (clarifying that "the two tests are more sensibly described as objective and subjective analyses of *expression.* ...") (emphasis in original).

 "The Cat in the Hat" is the central character in the original work, appearing in nearly every page of the Dr. Seuss work (26 times). Penguin and Dove appropriated the Cat's image, copying the Cat's Hat and using the image on the front and back covers and in the text (13 times). We conclude that substantial similarity exists on an objective and subjective level (see attachments # 1 and # 2). Penguin and Dove, however, maintain that they have not infringed on any one of Seuss' exclusive rights of copyright because *The Cat NOT in the Hat!* employed elements of the copyrighted work that are either uncopyrightable or that have fallen into the public domain.

---

3. "Analytic dissection" focuses on isolated elements of each work to the exclusion of the other elements, combination of elements, and expressions therein.

4. The district court observed: "Dr. Seuss has produced evidence that protected elements of three copyrighted works were incorporated into Penguin's book. Penguin responds that none of these examples of use could constitute infringement. Citing Professor Nimmer, Penguin argues that copyright infringement exists only in two forms: 'comprehensive non-literal similarity' and 'fragmented literal similarity.' Comprehensive non-literal similarity would be a paraphrasing of

an entire work; fragmented literal similarity would be a verbatim or near-verbatim copying of a small part of a work. Only these types of takings, Penguin argues, warrant a finding of infringement. The Court declines to follow Professor Nimmer's categories." The court then concluded: "In the Ninth Circuit, the issue is whether the works are substantially similar. Substantial similarity may be found whenever the works share significant similarity in protected expression both on an objective, analytical level and a subjective, audience-response level." The district court correctly portrayed the state of Ninth Circuit law on this issue.

■ Penguin and Dove's argument is based on an analytic dissection of the following elements: (1) infringement cannot be based on the title of the parody because it is "clear, as a matter of statutory construction by the courts (as well as Copyright Office regulations), that titles may not claim statutory copyright." *Nimmer on Copyright,* § 2.6, at 2–185–187 (footnotes omitted); (2) the design of the lettering of the words used in the accused work cannot be found to infringe, because Congress decided not to award copyright protection to design elements of letters. *Id.* § 2.15, at 2–178.6; (3) the poetic meter used in *Cat in the Hat* known as anapestic tetrameter is no more capable of exclusive ownership than its well-known counterpart, iambic pentameter; (4) no claim of ownership may be based on the whimsical poetic style that employs neologisms and onomatopoeia. *See v. Durang,* 711 F.2d 141, 143 (9th Cir.1983); and (5) the visual style of illustration using line drawing, coloring, and shading techniques similar to those used in *The Cat in the Hat* are not copyrightable. *See Midler v. Ford Motor Company,* 849 F.2d 460 (9th Cir.1988).[5] However, this kind of analytic dissection is not appropriate when conducting the subjective or "intrinsic test" (asking if an "ordinary reasonable person" would perceive a substantial taking of protected expression) under *Krofft.* Penguin and Dove's contentions on this issue are thus unavailing.

As for the objective analysis of expression, the district court's preliminary injunction was granted based on the back cover illustration and the Cat's Hat, *not* the typeface, poetic meter, whimsical style or visual style. For these reasons, we conclude that the court's findings that Penguin and Dove infringed on Seuss' copyrights are not clearly erroneous.

### III

■ Even if Seuss establishes a strong showing of copyright infringement on these facts, Penguin and Dove maintain that the taking would be excused as a parody under the fair use doctrine. Fair use is an "equitable rule of reason," *Sony Corp. of America v.*

*Universal City Studios, Inc.,* 464 U.S. 417, 448, 104 S.Ct. 774, 792, 78 L.Ed.2d 574 (1984), requiring careful balancing of multiple factors "in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 578, 114 S.Ct. 1164, 1171, 127 L.Ed.2d 500 (1994). The fair use defense "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Iowa State Univ. Research Found., Inc. v. American Broadcasting Cos.,* 621 F.2d 57, 60 (2d Cir.1980).

In § 107 of the 1976 Copyright Act, Congress laid down four factors to be considered and weighed by the courts in determining if a fair use defense exists in a given case: (1) the purpose and character of the accused use; (2) the nature of the copyrighted work; (3) the importance of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the accused use on the potential market for or value of the copyrighted work. 17 U.S.C. § 107. Congress viewed these four criteria as guidelines for "balancing the equities," not as "definitive or determinative" tests. H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 65 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5679. Congress observed that "since the doctrine [of fair use] is an equitable rule of reason, no generally applicable definition is possible." *Id.* The four fair use factors "are to be ... weighed together, in light of the objectives of copyright 'to promote the progress of science and the useful arts.'" *Id.* We now examine each factor.

### A

The first factor in a fair use inquiry is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." § 107(1). While this inquiry does not specify which purpose might render a given use "fair," the preamble to § 107 provides an illustrative, though not limitative, listing which includes "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."

---

**5.** We do not rule on the merits of each dissected element.

§ 107. Under this factor, the inquiry is whether *The Cat NOT in the Hat!* merely supersedes the Dr. Seuss creations, or whether and to what extent the new work is "transformative," i.e., altering *The Cat in the Hat* with new expression, meaning or message.

Parody is regarded as a form of social and literary criticism, having a socially significant value as free speech under the First Amendment. This court has adopted the "conjure up" test where the parodist is permitted a fair use of a copyrighted work if it takes no more than is necessary to "recall" or "conjure up" the object of his parody. *See MCA, Inc. v. Wilson,* 677 F.2d 180, 184 (2d Cir. 1981); *Warner Bros., Inc. v. American Broadcasting Cos.,* 523 F.Supp. 611, 617 (S.D.N.Y.), *aff'd,* 654 F.2d 204 (2d Cir.1981); *Walt Disney Prods. v. Air Pirates,* 581 F.2d 751, 757 (9th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979). Accordingly, the critical issue under this factor is whether *The Cat NOT in the Hat!* is a parody.[6] *See Acuff–Rose,* 510 U.S. at 582, 114 S.Ct. at 1173 ("The threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived.").

We first examine the definition of parody.[7] The parties disagree over the appropriate interpretation of *Acuff–Rose's* holding with respect to the definition of parody under the fair use exception. The Supreme Court of the United States in the *Acuff–Rose* case held that a rap group's version of Ray Orbison's song "Oh, Pretty Woman" was a candidate for a parody fair use defense.[8] Justice Souter, the opinion's author, defined parody:

For the purposes of copyright law, the nub of the definitions, and the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works.... If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger. *Id.* at 580, 114 S.Ct. at 1172 (citations omitted). The Court pointed out the difference between parody (in which the copyrighted work is the target) and satire (in which the copyrighted work is merely a vehicle to poke fun at another target): "Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing." *Id.* As Justice Kennedy put it in his concurrence: "The parody must target the original, and not just its general style, the genre of art to which it belongs, or society as a whole (although if it targets the original, it may target those features as well)." *Id.* at 597, 114 S.Ct. at 1180. The Second Circuit in *Rogers v. Koons,* 960 F.2d 301, 310 (2d Cir.1992), also emphasized that unless the plaintiff's copyrighted work is *at least in part the target* of the defendant's satire, then the defendant's work is not a "parody" in the legal sense:

---

**6.** The district court concluded that Penguin and Dove may not employ the four-factor fair use analysis if the infringing work is not a parody. The application of this presumption is in error. The Supreme Court has thus far eschewed bright line rules, favoring a case-by-case balancing.

**7.** Because debate still surrounds the proper definition of parody following *Acuff–Rose,* we briefly explore the word itself for guidance. Parody is one of four types of satire: diatribe, narrative, parody and burlesque. Highet, *The Anatomy of Satire* 13–14 (1962). The term has as its etymology the word "parodia" with the literal translation of "a song sung beside something."

**8.** Our analysis does not take into account whether *The Cat NOT in the Hat!* is in good or bad taste. As Justice Holmes explained, "[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits." *Acuff–Rose,* 510 U.S. at 582, 114 S.Ct. at 1173 (quoting *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 251, 23 S.Ct. 298, 300, 47 L.Ed. 460 (1903)).

It is the rule in this Circuit that though the satire need not be only of the copied work and may ... also be a parody of modern society, the copied work must be, at least in part, an object of the parody, otherwise there would be no need to conjure up the original work.... By requiring that the copied work be an object of the parody, we merely insist that the audience be aware that underlying the parody there is an original and separate expression, attributable to a different artist.

Similarly, the American Heritage Dictionary defines "parody" as a "literary or artistic work that broadly mimics an author's characteristic style and holds it up to ridicule."

We now turn our attention to *The Cat NOT in the Hat!* itself. The first two pages present a view of Los Angeles, with particular emphasis on the connection with Brentwood, given the depiction of the news camera lights. The story begins as follows:

A happy town
Inside L.A.
Where rich folks play
The day away.
But under the moon
The 12th of June.
Two victims flail
Assault! Assail!
Somebody will go to jail!
Who will it be?
Oh my! Oh me!

The third page reads: "One Knife? / Two Knife? / Red Knife / Dead Wife." This stanza no doubt mimics the first poem in Dr. Seuss' *One Fish Two Fish Red Fish Blue Fish:* "One fish / two fish / red fish / blue fish. Black fish / blue fish / old fish / new fish." For the next eighteen pages, Katz writes about Simpson's trip to Chicago, the noise outside Kato Kaelin's room, the bloody glove found by Mark Fuhrman, the Bronco chase, the booking, the hiring of lawyers, the assignment of Judge Ito, the talk show inter-

est, the comment on DNA, and the selection of a jury. On the hiring of lawyers for Simpson, Katz writes:

A plea went out to Rob Shapiro
Can you save the fallen hero?
And Marcia Clark, hooray, hooray
Was called in with a justice play.
A man this famous
Never hires
Lawyers like
Jacoby–Meyers.
When you're accused of a killing scheme
You need to build a real Dream Team.
Cochran! Cochran!
Doodle-doo
Johnnie, won't you join the crew?
Cochran! Cochran!
Deedle-dee
The Dream Team needs a victory.

These stanzas and the illustrations simply retell the Simpson tale. Although *The Cat NOT in the Hat!* does broadly mimic Dr. Seuss' characteristic style, it does not hold *his style* up to ridicule. The stanzas have "no critical bearing on the substance or style of" *The Cat in the Hat.* Katz and Wrinn merely use the Cat's stove-pipe hat, the narrator ("Dr.Juice"), and the title (*The Cat NOT in the Hat!*) "to get attention" or maybe even "to avoid the drudgery in working up something fresh." *Acuff–Rose,* 510 U.S. at 580, 114 S.Ct. at 1172. While Simpson is depicted 13 times in the Cat's distinctively scrunched and somewhat shabby red and white stove-pipe hat, the substance and content of *The Cat in the Hat* is not conjured up by the focus on the Brown–Goldman murders or the O.J. Simpson trial. Because there is no effort to create a transformative work with "new expression, meaning, or message," the infringing work's commercial use further cuts against the fair use defense.[9] *Id.* at 578, 114 S.Ct. at 1171.

---

**9.** Penguin and Dove emphasize that the Court in *Acuff–Rose* held that it was error to rule that the commercial, profit-making nature of the defendant's exploitation created a presumption of no fair use defense, overshadowing the other factors to be weighed as to fair use. We agree. Howev-

er, the district court's problem with the fair use defense on these facts was not with the commercial nature of the accused work. The court found that *The Cat NOT in the Hat!* was not entitled to a parody fair use defense because it failed to target the original work.

## B

The second statutory factor, "the nature of the copyrighted work," § 107(2), recognizes that creative works are "closer to the core of intended copyright protection" than informational and functional works, "with the consequence that fair use is more difficult to establish when the former works are copied." *Acuff–Rose*, 510 U.S. at 586, 114 S.Ct. at 1175. While this factor typically has not been terribly significant in the overall fair use balancing, the creativity, imagination and originality embodied in *The Cat in the Hat* and its central character tilts the scale against fair use.

## C

The third factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," § 107(3), are reasonable in relation to the purpose of the copying. This factor really raises the question of substantial similarity discussed in the preceding section, rather than whether the use is "fair." The district court concluded that "The Cat in the Hat" is the central character, appearing in nearly every image of *The Cat in the Hat.* Penguin and Dove appropriated the Cat's image, copying the Cat's Hat and using the image on the front and back covers and in the text (13 times). We have no doubt that the Cat's image is the highly expressive core of Dr. Seuss' work.

Under this factor, we also turn our attention "to the persuasiveness of a parodist's justification for the particular copying done, and the enquiry will harken back to the first of the statutory factors, for, as in prior cases, we recognize that the extent of permissible copying varies with the purpose and character of the use." *Acuff–Rose*, 510 U.S. at 586, 114 S.Ct. at 1175. Katz and Wrinn insist that they selected *The Cat in the Hat* as the vehicle for their parody because of the similarities between the two stories: Nicole Brown and Ronald Goldman were surprised by a "Cat" (O.J.Simpson) who committed acts contrary to moral and legal authority. The prosecution of Simpson created a horrible mess, in which the defense team seemed to impose "tricks" on an unwilling public, resulting in a verdict that a substantial segment of the public regarded as astonishing. Just as *The Cat in the Hat* ends with the moral dilemma of whether the children should tell their mother about their visitor that afternoon, Katz and Wrinn maintain that *The Cat NOT in the Hat!* ends with a similar moral dilemma:

JUICE

+ST

JUSTICE

Hmm . . . take the word JUICE.

Then add ST.

Between the U and I, you see.

And then you have JUSTICE.

Or maybe you don't.

Maybe we will.

And maybe we won't.

'Cause if the Cat didn't do it?

Then who? Then who?

Was it him?

Was it her?

Was it me?

Was it you?

Oh me! Oh my!

Oh my! Oh me!

The murderer is running free.

In their Opening Brief, Penguin and Dove characterize *The Cat NOT in the Hat!* ("Parody") as follows:

The Parody is a commentary about the events surrounding the Brown/Goldman murders and the O.J. Simpson trial, in the form of a Dr. Seuss parody that transposes the childish style and moral content of the classic works of Dr. Seuss to the world of adult concerns. The Parody's author felt that, by evoking the world of *The Cat in the Hat,* he could: (1) comment on the mix of frivolousness and moral gravity that characterized the culture's reaction to the events surrounding the Brown/Goldman murders, (2) parody the mix of whimsy and moral dilemma created by Seuss works such as *The Cat in the Hat* in a way that implied that the work was too limited to conceive the possibility of a *real* trickster "cat" who creates mayhem along with his friends Thing 1 and Thing 2, and then

magically cleans it up at the end, leaving a moral dilemma in his wake.

We completely agree with the district court that Penguin and Dove's fair use defense is "pure shtick" and that their post-hoc characterization of the work is "completely unconvincing."

## D

The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." § 107(4). Under this factor, we consider both the extent of market harm caused by the publication and distribution of *The Cat NOT in the Hat!* and whether unrestricted and widespread dissemination would hurt the potential market for the original and derivatives of *The Cat in the Hat.* The Second Circuit has characterized this factor as calling for the striking of a balance "between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied. The less adverse effect that an alleged infringing use has on the copyright owner's expectation of gain, the less public benefit need be shown to justify the use." *MCA, Inc. v. Wilson,* 677 F.2d 180, 183 (2d Cir.1981) (citations omitted). The good will and reputation associated with Dr. Seuss' work is substantial. Because, on the facts presented, Penguin and Dove's use of *The Cat in the Hat* original was nontransformative, and admittedly commercial, we conclude that market substitution is at least more certain, and market harm may be more readily inferred.

Since fair use is an affirmative defense, Penguin and Dove must bring forward favorable evidence about relevant markets. Given their failure to submit evidence on this point, instead confining "themselves to uncontroverted submissions that there was no likely effect on the market for the original," we conclude that "it is impossible to deal with the fourth factor except by recognizing that a silent record on an important factor bearing on fair use disentitle[s] the proponent of the defense," Penguin and Dove, to relief from the preliminary injunction. *Acuff-Rose,* 510 U.S. at 590–594, 114 S.Ct. at 1177–1179.

In light of the fair use analysis, we conclude that the district court's finding that Seuss showed a likelihood of success on the merits of the copyright claim was not clearly erroneous.[10]

## IV

■ We next examine whether serious questions for litigation and a balance of hardships favoring Seuss exist on the federal trademark and unfair competition claims.[11]

## A

The issue in trademark infringement actions is not the alleged appropriation of Seuss' creative expression, but rather, the likelihood of confusion in the market place as to the source of Penguin and Dove's *The Cat NOT in the Hat!.* "Likelihood of confusion" is the basic test for both common law trademark infringement and federal statutory trademark infringement.[12] 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 23.01[1] (rev. ed.1994). A federal claim under Lanham Act

---

**10.** This court can affirm the grant of the preliminary injunction based on the copyright *or* trademark infringement claims.

**11.** We reject outright Penguin and Dove's claim that the injunction in this case constitutes a prior restraint in violation of free speech guaranteed by the United States Constitution. *See, e.g., Anheuser-Busch, Inc. v. Balducci Publications,* 28 F.3d 769 (8th Cir.1994) (First Amendment did not protect parodist from liability for likelihood of confusion that existed between ad parody in humor magazine and trademarks.); *Silverman v. CBS, Inc.,* 870 F.2d 40, 49 (2d. Cir.), *cert. denied,* 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989) ("Trademark protection is not lost

simply because the allegedly infringing use is in connection with a work of artistic expression."); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir.1979) ("The prohibition of the Lanham Act is content neutral, and therefore does not arouse the fears that trigger the application of constitutional 'prior restraint' principles.") (citations omitted).

**12.** "The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 157, 109 S.Ct. 971, 980, 103 L.Ed.2d 118 (1989).

§ 43(a) for infringement of an unregistered mark is triggered by a use which "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of *The Cat NOT in the Hat!* with Seuss' *The Cat in the Hat.* Lanham Act § 43(a), 15 U.S.C. § 1125(a)(1)(A).

■ The eight-factor *Sleekcraft* test is used in the Ninth Circuit to analyze the likelihood of confusion question in all trademark infringement cases, both competitive and non-competitive. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir.1979).[13] The eight factors are as follows: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; (8) likelihood of expansion of the product lines. *Id.* at 348–49.

These factors are to be considered in reaching a decision on the issue of likelihood of confusion.[14] However, "[n]o mechanistic formula or list can set forth in advance" the variety of elements that comprise the market context from which likelihood of confusion must be determined. Restatement (Third) of Unfair Competition § 21, comment a (1995). The *Sleekcraft* court noted that this "list is not exhaustive" and "[o]ther variables may come into play depending on the particular facts presented." *Sleekcraft,* 599 F.2d at 348 n. 11.

■ We agree with the district court's findings that under *Sleekcraft* many of the factors for analysis of trademark infringement were indeterminate and posed serious questions for litigation. First, Penguin and Dove do not dispute that the Cat's stove-pipe hat, the words "Dr. Seuss," and the title "The Cat in the Hat" are widely recognized trademarks.[15] Second and third, the proximity and similarity between the marks and the infringing items are substantial: figures on the front and back of the infringing work; the Cat's stove-pipe hat; the narrator ("Dr. Seuss" versus "Dr. Juice"); and the title (*The Cat in the Hat versus The Cat NOT in the Hat!*). Below is one example:

**13.** The Ninth Circuit test for likelihood of confusion also has been described as a six-factor test in *J.B. Williams Co. v. Le Conte Cosmetics, Inc.,* 523 F.2d 187, 191 (9th Cir.1975), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976); *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1179 (9th Cir.1988); and a five-factor test in *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987). We use the eight-factor *Sleekcraft* test in this case simply to be over-inclusive. *See Eclipse Assocs., Ltd. v. Data General Corp.,* 894 F.2d 1114, 1118 (9th Cir.1990) (These factors are "helpful guidelines ... not meant to be requirements or hoops that a district court need jump through to make the determination.").

**14.** There are at least three types of proof of likelihood of confusion: (1) survey evidence; (2) evidence of actual confusion; and (3) an argument based on an inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace. In a close case amounting to a tie, doubts are resolved in favor of the senior user—Seuss.

**15.** Ownership of the protectible marks is undisputed. Penguin and Dove do not dispute that Seuss owns the common law rights and pending federal registrations to the trademarks.

Fourth, there is no evidence of actual confusion. Because *The Cat NOT in the Hat!* has been enjoined from distribution, there has been no opportunity to prove confusion in the market place. Fifth, the marketing channels used are indeterminate. Sixth, the use of the Cat's stove-pipe hat or the confusingly similar title to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, may be still an infringement. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 257–58 (2d Cir.1987). Seventh, Penguin and Dove's likely intent in selecting the Seuss marks was to draw consumer attention to what would otherwise be just one more book on the O.J. Simpson murder trial. Eighth and last, the likelihood of expansion of the product lines is indeterminate.

## B

▪ Even if Seuss establishes a likelihood of confusion, Penguin and Dove argue that their identical and confusingly similar use of Seuss' marks is offset by the work's parodic character. In a traditional trademark infringement suit founded on the likelihood of confusion rationale, the claim of parody is not really a separate "defense" as such, but merely a way of phrasing the traditional response that customers are not likely to be confused as to the source, sponsorship or approval. *Mutual of Omaha Ins. Co. v. Novak*, 648 F.Supp. 905, 910 (D.Neb.1986), *aff'd*, 836 F.2d 397 (8th Cir.1987). "Some parodies will constitute an infringement, some will not. But the cry of 'parody!' does not magically fend off otherwise legitimate claims of trademark infringement or dilution. There are confusing parodies and non-confusing parodies. All they have in common is an attempt at humor through the use of someone else's trademark. A non-infringing parody is merely amusing, not confusing." *McCarthy on Trademarks*, § 31.38[1], at 31–216 (rev. ed.1995).

In several cases, the courts have held, in effect, that poking fun at a trademark is no joke and have issued injunctions. Examples include: a diaper bag with green and red bands and the wording "Gucchi Goo," allegedly poking fun at the well-known Gucci name and the design mark, *Gucci Shops, Inc. v. R.H. Macy & Co.*, 446 F.Supp. 838 (S.D.N.Y.1977); the use of a competing meat sauce of the trademark "A.2" as a "pun" on the famous "A.1" trademark, *Nabisco Brands, Inc. v. Kaye*, 760 F.Supp. 25 (D.Conn.1991). Stating that, whereas a true parody will be so obvious that a clear distinction is preserved between the source of the target and the source of the parody, a court found that the "Hard Rain" logo was an infringement of the "Hard Rock" logo. In such a case, the claim of parody is no defense

"where the purpose of the similarity is to capitalize on a famous mark's popularity for the defendant's own commercial use." *Hard Rock Cafe Licensing Corp. v. Pacific Graphics, Inc.,* 776 F.Supp. 1454, 1462 (W.D.Wash. 1991).

## C

We are satisfied that the district court's determinations on the existence of serious questions for litigation and a balance of hardships favoring Seuss are not clearly erroneous. First, the district court properly found that serious questions exist for litigation because many of the factors for analysis of trademark infringement (i.e. likelihood of confusion) were indeterminate. Second, the good will and reputation associated with *The Cat in the Hat* character and title, the name "Dr. Seuss," and the Cat's Hat outweigh the $35,500 in expenses incurred by Penguin.

## V

Finally, we examine whether the injunction constitutes an abuse of discretion because it is overbroad. The district court's order enjoins defendants "from directly or indirectly printing, publishing, delivering, distributing, selling, transferring, advertising or marketing the book *The Cat NOT in the Hat! A Parody by Dr. Juice.*" Because only the back cover illustration and the Cat's stovepipe hat were deemed infringing by the district court, Penguin and Dove argue that the court should not have enjoined the entire book. However, they created the all-or-nothing predicament in which they currently find themselves. Even though the book had not yet been bound when Seuss initiated this action, Penguin and Dove still went forward with their production schedule and completed the stitching and binding. As a result, the publisher can no longer alter the final product to eliminate the infringing elements. Penguin and Dove's decision left the court no choice but to enjoin the entire book.

After carefully reviewing the record and considering all of the arguments on appeal, we find no reason to disturb the district court's carefully crafted and well-reasoned injunction order.

## VI

For the foregoing reasons, we affirm the district court's order granting a preliminary injunction prohibiting the publication and distribution of the infringing work.

AFFIRMED.

Attachment #1

Attachment #2

The Cat
NOT
in the
Hat!

A PARODY

By
Dr. Juice

AS TOLD TO ALAN KATZ
ILLUSTRATED BY CHRIS WRINN