**MATTEL INC., a Delaware Corporation, Plaintiff–Appellant,**

v.

**WALKING MOUNTAIN PRODUCTIONS, a California Business Entity; Tom Forsythe, an individual d/b/a Walking Mountain Productions, Defendants–Appellees.**

Mattel Inc., a Delaware Corporation,
Plaintiff–Appellee,

v.

Walking Mountain Productions, a California Business Entity; Tom Forsythe, an individual d/b/a Walking Mountain Productions, Defendants–Appellants.

Nos. 01–56695, 01–57193.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 6, 2003.

Filed Dec. 29, 2003.

Adrian M. Pruetz (argued), Michael T. Zeller, Edith Ramirez and Enoch Liang, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, for the plaintiff-appellant-cross-appellee.

Annette L. Hurst (argued), Douglas A. Winthrop and Simon J. Frankel, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, APC, San Francisco, CA, and Peter J. Eliasberg, ACLU, Los Angeles, CA, for the defendants-appellees-cross-appellants.

Annette L. Hurst, Douglas A. Winthrop and Simon J. Frankel, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, APC, San Francisco, CA, for non-party San Francisco Museum of Modern Art.

Before PREGERSON and THOMAS, Circuit Judges, and OBERDORFER, Senior District Judge.*

PREGERSON, Circuit Judge.

In the action before us, Plaintiff Mattel Corporation asks us to prohibit Defendant artist Thomas Forsythe from producing and selling photographs containing Mattel's "Barbie" doll. Most of Forsythe's photos portray a nude Barbie in danger of being attacked by vintage household appliances. Mattel argues that his photos infringe on their copyrights, trademarks, and trade dress. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm the district court's grant of summary judgment to Forsythe.

## BACKGROUND

Thomas Forsythe, aka "Walking Mountain Productions," is a self-taught photographer who resides in Kanab, Utah. He produces photographs with social and political overtones. In 1997, Forsythe developed a series of 78 photographs entitled "Food Chain Barbie," in which he depicted Barbie in various absurd and often sexualized positions.[1] Forsythe uses the word "Barbie" in some of the titles of his works. While his works vary, Forsythe generally depicts one or more nude Barbie dolls juxtaposed with vintage kitchen appliances. For example, "Malted Barbie" features a nude Barbie placed on a vintage Hamilton Beach malt machine. "Fondue a la Barbie" depicts Barbie heads in a fondue pot. "Barbie Enchiladas" depicts four Barbie dolls wrapped in tortillas and covered with salsa in a casserole dish in a lit oven.

In his declaration in support of his motion for summary judgment, Forsythe describes the message behind his photographic series as an attempt to "critique[ ] the objectification of women associated with [Barbie], and [ ][to] lambast[ ] the conventional beauty myth and the societal acceptance of women as objects because this is what Barbie embodies." He explains that he chose to parody Barbie in his photographs because he believes that "Barbie is the most enduring of those products that feed on the insecurities of our beauty and perfection-obsessed consumer culture." Forsythe claims that, throughout his series of photographs, he attempts to communicate, through artistic expression, his serious message with an element of humor.

Forsythe's market success was limited. He displayed his works at two art festivals—the Park City Art Festival in Park City, Utah, and the Plaza Art Fair in Kansas City, Missouri.[2] He promoted his

---

* The Honorable Louis F. Oberdorfer, Senior Judge, United States District Court for the District of Columbia, sitting by designation.

1. Forsythe possessed slides of 386 additional photographs that he never published, distributed, or sold because he considered them inadequate for the series.

2. Additionally, Forsythe's works were chosen for display in various exhibitions, including the Dishman Competition at Lamar University in Texas, and the Through the Looking Glass Art Show in Los Alamos, New Mexico. Some of his "Food Chain Barbie" photographs were also selected for exhibition by the Deputy Director and Chief Curator of the

works through a postcard, a business card, and a website. Forsythe printed 2000 promotional postcards depicting his work, "Barbie Enchiladas," only 500 of which were ever circulated. Of those that were circulated, some were distributed throughout his hometown of Kanab and some to a feminist scholar who used slides of Forsythe's works in her academic presentations. He also sold 180 of his postcards to a friend who owned a book store in Kanab so she could resell them in her bookstore and sold an additional 22 postcards to two other friends. Prior to this lawsuit, Forsythe received only four or five unsolicited calls inquiring about his work. The "Food Chain Barbie" series earned Forsythe total gross income of $3,659.[3]

Forsythe also produced 1,000 business cards which depicted "Champagne Barbie." His name and self-given title "Artsurdist" were written on the card. He used these cards at fairs and as introductions to gallery owners.

Finally, Forsythe had a website on which he depicted low resolution pictures of his photographs. The website was not configured for online purchasing. "Tom Forsythe's Artsurdist Statement," in which he described his intent to critique and ridicule Barbie, was featured on his website. His website also contained a prominent link to his biography.

On August 23, 1999, Mattel filed this action in the United States District Court for the Central District of California (the "Los Angeles federal district court") against Forsythe, alleging that Forsythe's "Food Chain Barbie" series infringed Mattel's copyrights, trademarks, and trade dress. Forsythe filed a motion to dismiss Mattel's First Amended Complaint, which was granted with leave to amend. Mattel filed a Second Amended Complaint, and Forsythe again moved for dismissal. The motion was granted in part; the court dismissed with prejudice Mattel's Eleventh Claim for federal trade libel.

On August 11, 2000, Mattel moved for a preliminary injunction. The district court denied the motion; we summarily affirmed. *Mattel, Inc. v. Walking Mountain Prods.*, No. 00–56733, 4 Fed.Appx. 400, 2001 WL 133145(9th Cir. Feb.15, 2001) (unpublished).

During discovery, Forsythe served on Mattel the Federal Rule of Civil Procedure 26(a)(2)(B) expert witness report of Dr. Douglas Nickel, an expert on art history and curator of photography at the San Francisco Museum of Modern Art (the "SFMOMA"). Nickel's report focused on the traditions of twentieth century artists, in which Forsythe's works were properly understood.

On April 30, 2001, after receiving that report, Mattel subpoenaed Dr. Nickel to appear for a deposition and to produce certain documents. On or about May 15, 2001, Mattel served a Federal Rule of Civil Procedure 30(b)(6) subpoena on the SFMOMA (the "Subpoena" or "SFMOMA Subpoena"), a non-party to this action.[4] The Subpoena demanded all documents relating to Forsythe and his works, all docu-

---

Guggenheim Museum of Modern Art in New York.

3. Purchases by Mattel investigators comprised at least half of Forsythe's total sales.

4. Rule 30(b)(6) depositions, such as the one demanded by Mattel in the Subpoena, are often referred to as "persons most knowledge-

able" or "persons most qualified" depositions because "the notice of deposition or subpoena is directed at the entity itself" and "[t]he entity will then be obligated to produce the 'most qualified' person[or persons] to testify on its behalf...." Schwarzer, Tashima & Wagstaffe, Cal. Prac. Guide: Fed. Civ. Pro. Before Trial ¶ 11:1409 at 11–142 (The Rutter Group 2003).

ments relating to Mattel or Barbie, and all documents relating to the SFMOMA's "policy or practice relating to the third-party copying, reproduction, or photo-graphing" of works in which the SFMOMA had a proprietary interest. The Subpoena also demanded that the SFMOMA produce a witness or witnesses to testify at deposition on various topics including the following: licensing of artworks owned by SFMOMA, including licensed products, royalty rates, and the advertising markets, and sales channels for such products and "the number, identity, nature and results of lawsuits or other legal action taken ... or cease and desist letters sent by" the SFMOMA over the past five years related to reproduction of artwork owned by the SFMOMA. On May 24, 2001, the SFMO-MA served written objections to the Subpoena on Mattel.

On May 30, 2001, Mattel filed an ex parte application in the United States District Court for the Northern District of California (the "San Francisco federal district court") to enforce the Subpoena and to compel the SFMOMA to produce documents and its representative(s) for a deposition. Mattel claimed that the Subpoena would aid discovery in Mattel's action against Forsythe. The SFMOMA opposed the ex parte application.

On June 4, 2001, the San Francisco federal district court denied the application, quashed the Subpoena, and held that it would award the SFMOMA's counsel fees and expenses incurred in opposing the application. The parties were unable to agree on fees, and the SFMOMA's counsel submitted an itemized statement of fees and costs. The court subsequently issued

a written "Order Determining Amount of Attorney's Fees," denying the Application, quashing the Subpoena, and sanctioning Mattel.

On July 16, 2001, Forsythe moved for summary judgment in the Los Angeles federal district court. He also moved to exclude all or portions of the reports and testimony of Mattel's experts (Boles, Kinrich, Lynde, Marylander, and Schwartz) and a videotape of him destroying his Barbie collection.[5] Mattel filed a cross-motion for summary judgment on some of Forsythe's affirmative defenses.

On August 22, 2001, the Los Angeles federal district court granted Forsythe's motion for summary judgment. The district court held that Forsythe's use of Mattel's copyrighted work was fair use. The court found that Forsythe's use of Mattel's trademark and trade dress caused no likelihood of confusion as to Mattel's sponsorship of Forsythe's works. The court dismissed Mattel's trademark dilution claim because it found that Forsythe's use had been "noncommercial." The court further found that Mattel's remaining state claims failed as a matter of law.

On Forsythe's motion to exclude the reports and testimony of Mattel's experts and to exclude Forsythe's videotape, the court excluded the report and testimony of Mattel expert Boles and Forsythe's "execution" videotape because they were irrelevant. The court, however, denied Forsythe's motion to exclude the reports and testimony of Mattel experts Marylander, Schwartz, and Kinrich. The court then denied Mattel's cross-motion for summary judgment on Forsythe's affirmative defenses as moot.

5. In December 1999, after Mattel had served Forsythe with its complaint, Forsythe videotaped himself "execut[ing]" his collection of Barbies. Forsythe claims he did this to "let off steam" and as a "humorous statement."

Forsythe never sent this videotape to anyone. In June 2000, Forsythe provided the videotape to his counsel, and a copy of it was produced in response to Mattel's document requests.

Mattel appeals the Los Angeles federal district court's grant of summary judgment in favor of Forsythe on the trademark, copyright, and state law claims. Mattel also appeals the Los Angeles federal district court's dismissal of its false advertising claim. Finally, Mattel appeals the San Francisco federal district court's order quashing the discovery subpoena that Mattel served on the SFMOMA and the court's order requiring Mattel to pay attorney's fees to the SFMOMA's counsel.

Forsythe cross-appeals the Los Angeles federal district court's order denying him attorney's fees and costs under the Copyright and Lanham Acts.

## DISCUSSION

### I.

▪ We first address the question whether the Los Angeles federal district court erred in granting Forsythe's motion for summary judgment on Mattel's claim of copyright infringement. We review de novo a grant of summary judgment. *See Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir.2002). Viewing the evidence in light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact that remain for trial and whether the district court correctly applied the relevant substantive law. *Id.* We also review the district court's finding of fair use under the Copyright Act, a mixed question of law and fact, by the same de novo standard. *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817(9th Cir.2003).

▪ The Copyright Act, 17 U.S.C. § 106, protects the owner of a copyright by granting him or her exclusive rights to "reproduce, distribute, and publicly display copies of the work." *Kelly*, 336 F.3d at 817 (distilling 17 U.S.C. § 106). A prima facie case of copyright infringement by reproduction is established by showing ownership by the plaintiff and copying by the defendant. *Id.* Mattel owns the copyright to the unadorned Superstar Barbie head[6] and parts of the figure including revisions to the hands, feet, neck, shoulder and buttocks. Because Forsythe photographed the Barbie figure and reproduced those photographs, Mattel has established a prima facie case of copyright infringement.

▪ Consistent with its policy goals, however, the Copyright Act recognizes certain statutory exceptions to protections on copyrights. At its core, the Act seeks to promote the progress of science and art by protecting artistic and scientific works while encouraging the development and evolution of new works. *See Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 575–76, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). Recognizing that science and art generally rely on works that came before them and rarely spring forth in a vacuum, the Act limits the rights of a copyright owner regarding works that build upon, reinterpret, and reconceive existing works. *See id.* at 575–77, 114 S.Ct. 1164 ("[F]ew, if any, things ... are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow ...") (quoting *Emerson v. Davies*, 8 F. Cas. 615, 619(C.C.D.Mass.1845) (No. 4,436)). The fair use exception excludes from copyright restrictions certain works, such as those that criticize and comment on another work. 17 U.S.C. § 107. *See also Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394,

---

**6.** "Unadorned" includes only the facial structure without hair, eyebrows, eye color, eye lashes, lip color, and painted teeth.

1399 (9th Cir.) (holding that fair use "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster"), *cert. dismissed,* 521 U.S. 1146, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997).

■ To determine whether a work constitutes fair use, we engage in a case-by-case analysis and a flexible balancing of relevant factors. *Campbell,* 510 U.S. at 577–78, 114 S.Ct. 1164. The factors are "to be explored, and the results weighed together, in light of the purposes of copyright." *Id.* at 578, 114 S.Ct. 1164. Depending on the particular facts, some factors may weigh more heavily than others. *Id.* at 577–79, 114 S.Ct. 1164. The four factors we consider are: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Dr. Seuss,* 109 F.3d at 1399–1404 (analyzing and applying 17 U.S.C. § 107).

The district court concluded that Forsythe's reproduction of Mattel's copyrighted Barbie was fair use. The district court reasoned that a trier of fact could only conclude that Forsythe's works were fair use because: (1) his use was parody meant to criticize Barbie, (2) he only copied what was necessary for his purpose, and (3) his photographs could not affect the market demand for Mattel's products or those of its licensees.

■ Where material facts are not in dispute, fair use is appropriately decided on summary judgment. *Harper & Row, Inc. v. Nation Enters.,* 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). We

recently noted "[a]s fair use is a mixed question of fact and law, so long as the record is 'sufficient to evaluate each of the statutory factors,' we may reweigh on appeal the inferences to be drawn from that record." *L.A. News Serv. v. CBS Broad., Inc.,* 305 F.3d 924, 942 (quoting *Harper & Row,* 471 U.S. at 560, 105 S.Ct. 2218), *as amended,* 313 F.3d 1093 (9th Cir.2002).

■ Because we agree with the district court that no triable issues of fact exist on whether Forsythe's use of Mattel's Barbie constitutes fair use, we weigh the four § 107 fair use factors on appeal. We conclude that Forsythe's use of Mattel's copyrighted Barbie constitutes fair use and affirm the district court's grant of summary judgment.

### A. Purpose and Character of Use

The "purpose and character of use" factor in the fair use inquiry asks "to what extent the new work is transformative" and does not simply "supplant[ ]" the original work and whether the work's purpose was for- or not-for-profit. *Campbell,* 510 U.S. at 579, 584, 114 S.Ct. 1164.

A work must add "something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* at 579, 114 S.Ct. 1164. The Supreme Court has recognized that parodic works, like other works that comment and criticize, are by their nature often sufficiently transformative to fit clearly under the fair use exception. *Id.* (recognizing that parody "has an obvious claim to transformative value"). In our circuit, a "parodist is permitted a fair use of a copyrighted work if it takes no more than is necessary to 'recall' or 'conjure up' the object of his parody." *Dr. Seuss,* 109 F.3d at 1400. A parodic work, however, like other potential fair uses, has to "work its way through the relevant fac-

tors, and be judged case by case, in light of the ends of copyright law." *Campbell*, 510 U.S. at 581, 114 S.Ct. 1164.

"[T]he threshold question[in the analysis of this first factor] ... is whether a parodic character may reasonably be perceived." *Id.* at 582, 114 S.Ct. 1164. *See also Dr. Seuss*, 109 F.3d at 1400. Mattel argues that the district court erred in finding parody because a reasonable jury could conclude that Forsythe's works do not parody Mattel's Barbie. In support of this argument, Mattel offered into evidence a survey in which they presented individuals from the general public in a shopping mall with color photocopies of Forsythe's photographs and asked them what meaning they perceived. Relying on this survey, Mattel asserts that only some individuals may perceive parodic character.

■ The issue of whether a work is a parody is a question of law, not a matter of public majority opinion. *See Campbell*, 510 U.S. at 582–83, 114 S.Ct. 1164; *Dr. Seuss*, 109 F.3d at 1400–01 ("[U]nless the plaintiff's copyrighted work is at least in part the target of the defendant's satire, then the defendant's work is not a 'parody' in the *legal sense* ...." (emphasis added)). Forsythe correctly points out that Mattel presents no case law in support of its contention that the parodic nature of a defendant's work should be assessed using surveys and opinion testimony. Forsythe is further correct that every court to address the issue whether a defendant's work qualifies as a parody has treated this question as one of law to be decided by the court. *E.g., Campbell*, 510 U.S. at 582–83, 114 S.Ct. 1164; *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 114–15 (2d Cir.1998); *Dr. Seuss*, 109 F.3d at 1400–01.

We decline to consider Mattel's survey in assessing whether Forsythe's work can be reasonably perceived as a parody. Parody is an objectively defined rhetorical de-

vice. Further, because parody is "a form of social and literary criticism," it has "socially significant value as free speech under the First Amendment." *Dr. Seuss*, 109 F.3d at 1400. While individuals may disagree on the success or extent of a parody, parodic elements in a work will often justify fair use protection. *See, e.g., Yankee Publ'g, Inc. v. News Am. Publ'g, Inc.*, 809 F.Supp. 267, 280 (S.D.N.Y.1992) ("First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed."). Use of surveys in assessing parody would allow majorities to determine the parodic nature of a work and possibly silence artistic creativity. Allowing majorities to determine whether a work is a parody would be greatly at odds with the purpose of the fair use exception and the Copyright Act. *See generally Campbell*, 510 U.S. at 583, 114 S.Ct. 1164.

■ A parody is a "literary or artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule." *Id.* at 580, 114 S.Ct. 1164(quoting AMERICAN HERITAGE DICTIONARY 1317 (3d.1992)). For the purposes of copyright law, a parodist may claim fair use where he or she uses some of the "elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." *Id.* The original work need not be the sole subject of the parody; the parody "may loosely target an original" as long as the parody "reasonably could be perceived as commenting on the original or criticizing it, to some degree." *Id.* at 580–81, 583, 114 S.Ct. 1164. That a parody is in bad taste is not relevant to whether it constitutes fair use; "it would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work]." *Id.* at 582–83, 114 S.Ct. 1164(quoting *Bleistein v.*

*Donaldson Lithographing Co.,* 188 U.S. 239, 251, 23 S.Ct. 298, 47 L.Ed. 460 (1903)).

In assessing whether Forsythe's photographs parody Barbie, Mattel urges us to ignore context—both the social context of Forsythe's work and the actual context in which Mattel's copyrighted works are placed in Forsythe's photographs. However, "[i]n parody, as in news reporting, context is everything." *Id.* at 588, 114 S.Ct. 1164 (citations omitted). We conclude that Forsythe's work may reasonably be perceived as a parody of Barbie.

Mattel, through impressive marketing, has established Barbie as "the ideal American woman" and a "symbol of American girlhood" for many. *Mattel, Inc. v. MCA Records, Inc. ("MCA"),* 296 F.3d 894, 898 (9th Cir.2002), *cert. denied,* 537 U.S. 1171, 123 S.Ct. 993, 154 L.Ed.2d 912 (2003). As abundantly evidenced in the record, Mattel's advertisements show these plastic dolls dressed in various outfits, leading glamorous lifestyles and engaged in exciting activities. To sell its product, Mattel uses associations of beauty, wealth, and glamour.

Forsythe turns this image on its head, so to speak, by displaying carefully positioned, nude, and sometimes frazzled looking Barbies in often ridiculous and apparently dangerous situations. His lighting, background, props, and camera angles all serve to create a context for Mattel's copyrighted work that transform Barbie's meaning. Forsythe presents the viewer with a different set of associations and a different context for this plastic figure. In some of Forsythe's photos, Barbie is about to be destroyed or harmed by domestic life in the form of kitchen appliances, yet continues displaying her well known smile, disturbingly oblivious to her predicament. As portrayed in some of Forsythe's photographs, the appliances are substantial and overwhelming, while Barbie looks defenseless. In other photographs, Forsythe conveys a sexualized perspective of Barbie by showing the nude doll in sexually suggestive contexts. It is not difficult to see the commentary that Forsythe intended or the harm that he perceived in Barbie's influence on gender roles and the position of women in society.

However one may feel about his message—whether he is wrong or right, whether his methods are powerful or banal—his photographs parody Barbie and everything Mattel's doll has come to signify. Undoubtedly, one could make similar statements through other means about society, gender roles, sexuality, and perhaps even social class. But Barbie, and all the associations she has acquired through Mattel's impressive marketing success, conveys these messages in a particular way that is ripe for social comment.[7]

Parody emerges from this "joinder of reference and ridicule." *Campbell,* 510 U.S. at 583, 114 S.Ct. 1164; *cf. Dr. Seuss,* 109 F.3d at 1401 (holding that de-

---

7. Mattel strongly argues that Forsythe's work is not parody because he could have made his statements about consumerism, gender roles, and sexuality without using Barbie. Acceptance of this argument would severely and unacceptably limit the definition of parody. We do not make judgments about what objects an artist should choose for their art. For example, in *Campbell,* the Supreme Court found that hip-hop band 2–Live Crew's rendition of "Pretty Woman" was a parody because it targeted the original song and com-

mented "on the naivete of the original of an earlier day, as a rejection of its sentiment that ignores the ugliness of street life and the debasement that it signifies." 510 U.S. at 583, 114 S.Ct. 1164. No doubt, 2–Live Crew could have chosen another song to make such a statement. Parody only requires that "the plaintiff's copyrighted work is at least in part the target of the defendant's satire," not that the plaintiff's work be the irreplaceable object for its form of social commentary. *Dr. Seuss,* 109 F.3d at 1400.

fendants who wrote a poem titled "Cat NOT in the HAT" about the O.J. Simpson trial were not parodying Dr. Suess' original work because the stanzas had "no critical bearing on the substance or style of" the original). By developing and transforming associations with Mattel's Barbie doll, Forsythe has created the sort of social criticism and parodic speech protected by the First Amendment and promoted by the Copyright Act. We find that this factor weighs heavily in favor of Forsythe.

Another element of the first factor analysis is whether the work's "purpose" was commercial or had a non-profit aim. *Campbell*, 510 U.S. at 584, 114 S.Ct. 1164. Clearly, Forsythe had a commercial expectation and presumably hoped to find a market for his art. However, as the Supreme Court noted in *Campbell*, even works involving comment and criticism "are generally conducted for profit in this country." *Id.* (quoting *Harper & Row*, 471 U.S. at 592, 105 S.Ct. 2218.) On balance, Forsythe's commercial expectation does not weigh much against him. Given the extremely transformative nature and parodic quality of Forsythe's work, its commercial qualities become less important. *Id.* at 579, 105 S.Ct. 2218 (recognizing that the more "transformative the new work, the less will be the significance of the other factors").

## B. *Nature of the copyrighted work*

The second factor in the fair use analysis "recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works." *Dr. Seuss*, 109 F.3d at 1402 (quoting *Campbell*, 510 U.S. at 586, 114

S.Ct. 1164). Mattel's copyrighted Barbie figure and face can fairly be said to be a creative work. However, the creativity of Mattel's copyrighted Barbie is typical of cases where there are infringing parodies. *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164 ("[P]arodies almost invariably copy publicly known, expressive works."). As we have recognized in the past, "this [nature of the copyrighted work] factor typically has not been terribly significant in the overall fair use balancing." *Dr. Seuss*, 109 F.3d at 1402. In any event, it may weigh slightly against Forsythe.

## C. *Amount and substantiality of the portion used.*

The third factor in the fair use analysis asks whether " 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole,' are reasonable in relation to the purpose of copying." *Id.* (quoting 17 U.S.C. § 107(3)). We assess the "persuasiveness of a parodist's justification for the particular copying done," recognizing that the "extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586–87, 114 S.Ct. 1164.

Mattel argues that Forsythe used the entirety of its copyrighted work and that this factor weighs against him. Mattel contends that Forsythe could have used less of the Barbie figure by, for example, limiting his photos to the Barbie heads.

First, Forsythe did not simply copy the work "verbatim" with "little added or changed." *Id.* at 587–88, 114 S.Ct. 1164.[8] A verbatim copy of Barbie would be an exact three dimensional reproduction of the doll. Forsythe did not display the

---

**8.** We have, however, held that entire verbatim reproductions are justifiable where the purpose of the work differs from the original. *Kelly*, 336 F.3d at 821("This factor neither weighs for nor against either party because,

although [the defendant] did copy each of [the plaintiff's] images as a whole, it was reasonable to do so in light of[the defendant's] use of the images.").

entire Barbie head and body in his photographs. Parts of the Barbie figure are obscured or omitted depending on the angle at which the photos were taken and whether other objects obstructed a view of the Barbie figure.

Second, Mattel's argument that Forsythe could have taken a lesser portion of its work attempts to benefit from the somewhat unique nature of the copyrighted work in this case. Copyright infringement actions generally involve songs, video, or written works. *See, e.g., Elvis Presley Enters., Inc. v. Passport Video,* 349 F.3d 622 (9th Cir.2003) (use of copyrighted Elvis Presley-related video clips, photographs, and music); *Los Angeles News Serv.,* 305 F.3d at 924 (use of a few seconds of a copyrighted video footage by a news service); *Worldwide Church of God v. Phila. Church of God, Inc.,* 227 F.3d 1110 (9th Cir.2000) (reproduction and distribution by nonprofit organization of an entire copyrighted work), *cert. denied,* 532 U.S. 958, 121 S.Ct. 1486, 149 L.Ed.2d 373 (2001); *Dr. Seuss,* 109 F.3d at 1394 (use of Dr. Suess's "Cat in the Hat" format in written work about the O.J. Simpson trial). Because parts of these works are naturally severable, the new work can easily choose portions of the original work and add to it. Here because the copyrighted material is a doll design and the infringing work is a photograph containing that doll, Forsythe, short of severing the doll, must add to it by creating a context around it and capturing that context in a photograph. For our purposes, Forsythe's use is no different from that of a parodist taking a basic melody and adding elements that transform the work. *See Campbell,* 510 U.S. at 589, 114 S.Ct. 1164(noting that 2 Live Crew's rendition of "Pretty Woman" did not approach verbatim copying because, even though 2 Live Crew may have taken the most recognizable portion of the work, it

had added "scraper" noises and overlays to the music). In both Forsythe's use of the entire doll and his use of dismembered parts of the doll, portions of the old work are incorporated into the new work but emerge imbued with a different character.

Moreover, Forsythe was justified in the amount of Mattel's copyrighted work that he used in his photographs. Mattel's argument that Forsythe could have used a lesser portion of the Barbie doll is completely without merit and would lead to absurd results. We do not require parodic works to take the absolute minimum amount of the copyrighted work possible. As the Supreme Court stated in *Campbell,* "[o]nce enough has been taken to assure identification, how much more is reasonable will depend, say, on the extent to which the[work's] overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original." *Id.* at 587, 114 S.Ct. 1164. We conclude that the extent of Forsythe's copying of the Barbie figure and head was justifiable in light of his parodic purpose and medium used. This factor also weighs in his favor.

D. *Effect of the use upon potential market*

The fourth factor asks whether actual market harm resulted from the defendant's use of plaintiff's protected material and whether "unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market" for the original or its derivatives. *Id.* at 590, 114 S.Ct. 1164 (quoting 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A](4), at 13–102.61 (1993)). This inquiry attempts to strike a balance between

the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied. The less adverse effect that an alleged infringing use has on the copyright owner's expectation of gain, the less public benefit need be shown to justify the use.

*Dr. Seuss,* 109 F.3d at 1403(quoting *MCA, Inc. v. Wilson,* 677 F.2d 180, 183 (2d Cir. 1981)).

Mattel argues that Forsythe's work could lead to market harm by impairing the value of Barbie itself, Barbie derivatives,[9] and licenses for use of the Barbie name and/or likeness to non-Mattel entities.[10] Because of the parodic nature of Forsythe's work, however, it is highly unlikely that it will substitute for products in Mattel's markets or the markets of Mattel's licensees. In *Campbell,* the Court clearly stated, "as to parody pure and simple, it is more likely that the new work will not affect the market for the original in a way cognizable under this factor." *Campbell,* 510 U.S. at 591, 114 S.Ct. 1164. Nor is it likely that Mattel would license an artist to create a work that is so critical of Barbie. "[T]he unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market." *Id.* at 592, 114 S.Ct. 1164.

As to Mattel's claim that Forsythe has impaired Barbie's value, this fourth factor does not recognize a decrease in value of a copyrighted work that may result from a particularly powerful critical work. *Id.* at 593, 114 S.Ct. 1164("The fact that a parody may impair the market for derivative uses by the very effectiveness of its critical commentary is no more relevant under copyright than the like threat to the original market. . . ."). We recognize, however, that critical works may have another dimension beyond their critical aspects that may have effects on potential markets for the copyrighted work. *Id.* at 592, 114 S.Ct. 1164(recognizing that the new work "may have a more complex character, with effects not only in the arena of criticism but also in protectable markets for derivative works"). Thus, we look more generally, not only to the critical aspects of a work, but to the type of work itself in determining market harm. *Id.* at 593, 114 S.Ct. 1164 (looking beyond the critical aspect of 2 Live Crew's rap rendition of "Pretty Woman" to the derivative market for rap music). Given the nature of Forsythe's photographs, we decline Mattel's invitation to look to the licensing market for art in general. Forsythe's photographs depict nude and often sexualized figures, a category of artistic photography that Mattel is highly unlikely to license. "The existence of this potential market cannot be presumed." *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.,* 964 F.2d 965, 972(9th Cir.1992), *cert. denied,* 507 U.S. 985, 113 S.Ct. 1582, 123 L.Ed.2d 149 (1993).

In a case almost identical to this one, *Mattel, Inc. v. Pitt ("Pitt"),* 229 F.Supp.2d 315, 321–22 (S.D.N.Y.2002), the Southern District Court of New York found no danger of potential market harm to derivative uses. In *Pitt,* Mattel brought a copyright

9. By "derivatives," we refer to the numerous other Mattel products in the Barbie line, such as the "Ken" doll (Barbie's boyfriend); the "Kira," "Skipper," and "Teresa" dolls (Barbie's friends); the "Splash Cycle" (a three-wheeled amphibious cycle on which Barbie can sit); and the "Barbie Dream House" (a battery operated two-story Victorian-style dollhouse).

10. We address only potential harm because the actual harm to works of Mattel's licensees was non-existent.

infringement suit against Susanne Pitt, an artist who sold and designed a line of figures called "Dungeon Dolls." These dolls were essentially Barbie dolls, physically altered, clothed in sadomasochistic attire, and placed in contexts with like themes. *Id.* Having found the works sufficiently transformative, the *Pitt* court concluded that potential market harm was improbable because Mattel was unlikely to develop or license others to develop a product in the "adult" doll market. *Id.* at 324.

Forsythe's work could only reasonably substitute for a work in the market for adult-oriented artistic photographs of Barbie. We think it safe to assume that Mattel will not enter such a market or license others to do so. As the Court noted in *Campbell*, "the market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." 510 U.S. at 592, 114 S.Ct. 1164.

Finally, the public benefit in allowing artistic creativity and social criticism to flourish is great. The fair use exception recognizes this important limitation on the rights of the owners of copyrights. No doubt, Mattel would be less likely to grant a license to an artist that intends to create art that criticizes and reflects negatively on Barbie's image. It is not in the public's interest to allow Mattel complete control over the kinds of artistic works that use Barbie as a reference for criticism and comment.

Having balanced the four § 107 fair use factors, we hold that Forsythe's work constitutes fair use under § 107's exception.

His work is a parody of Barbie and highly transformative. The amount of Mattel's figure that he used was justified. His infringement had no discernable impact on Mattel's market for derivative uses. Finally, the benefits to the public in allowing such use—allowing artistic freedom and expression and criticism of a cultural icon—are great. Allowing Forsythe's use serves the aims of the Copyright Act by encouraging the very creativity and criticism that the Act protects. *Kelly*, 336 F.3d at 819–20. We affirm the district court on its grant of summary judgment on Mattel's copyright infringement claims.

## II.

We now address whether the district court erred in granting summary judgment in favor of Forsythe on Mattel's claims of trademark and trade dress infringement and dilution.[11] As above, we review de novo a grant of summary judgment. *See Oliver*, 289 F.3d at 626.

### A. *Trademark* [12]

The limited purpose of trademark protections set forth in the Lanham Trade–Mark Act, 15 U.S.C. § 1051 *et. seq.*, is to "avoid confusion in the marketplace" by allowing a trademark owner to "prevent[ ] others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner." *MCA*, 296 F.3d at 900. Trademark law aims to protect trademark owners from a false perception that they are associated with or endorse a product. *See Cairns*, 292 F.3d at 1149–50. Generally, to assess whether a defendant has infringed on a

---

**11.** We note that, at the time that the Los Angeles federal district court decided this case, it did not have the benefit of our decision in *Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir.2002).

**12.** A trademark is a limited property right in particular word, phrase, or symbol, 15 U.S.C. § 1051, that "is used to identify a manufacturer or sponsor of a good or the provider of a service." *MCA*, 296 F.3d at 900.

plaintiff's trademark, we apply a "likelihood of confusion" test that asks whether use of the plaintiff's trademark by the defendant is "likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association" of the two products. *Id.* at 1149(quoting 15 U.S.C. § 1125(a)(1)(A)).

■■■ As we recently recognized in *MCA,* however, when marks "transcend their identifying purpose" and "enter public discourse and become an integral part of our vocabulary," they "assume[ ] a role outside the bounds of trademark law." 296 F.3d at 900. Where a mark assumes such cultural significance, First Amendment protections come into play. *Id.* In these situations, "the trademark owner does not have the right to control public discourse whenever the public imbues his mark with a meaning beyond its source-identifying function." *Id.See also New Kids on the Block v. News Am. Publ'g Inc.,* 971 F.2d 302, 307 (9th Cir.1992).

As we determined in *MCA,* Mattel's "Barbie" mark has taken on such a role in our culture. 296 F.3d at 898–99. In *MCA,* Mattel brought an identical claim against MCA Records, producers of a song entitled "Barbie Girl" that contained lyrics that parodied and mocked Barbie. *Id.* at 894. Recognizing that First Amendment concerns in free expression are particularly present in the realm of artistic works, we rejected Mattel's claim. In doing so, we adopted the Second Circuit's First Amendment balancing test for applying the Lanham Act to titles of artistic works as set forth in *Rogers v. Grimaldi,* 875 F.2d 994, 999 (2d Cir.1989). *MCA,* 296 F.3d at 902.

The *Rogers* balancing test requires courts to construe the Lanham Act "to apply to artistic works *only* where the public interest in avoiding consumer confusion *outweighs* the public interest in free expression." *Rogers,* 875 F.2d at 999(emphasis added). Accordingly, the *Rogers* test prohibits application of the Lanham Act to titles of artistic works unless the title "has no artistic relevance to the underlying work whatsoever or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." *Id.*

■■■ Application of the *Rogers* test here leads to the same result as it did in *MCA.* Forsythe's use of the Barbie mark is clearly relevant to his work. *See MCA,* 296 F.3d at 902 ("[T]he use of Barbie in the song title clearly is relevant to the underlying work, namely, the song itself."). The Barbie mark in the titles of Forsythe's works and on his website accurately describe the subject of the photographs, which in turn, depict Barbie and target the doll with Forsythe's parodic message. *See id.* ("[T]he song is about Barbie and the values [the defendants] claim[ ] she represents.") The photograph titles do not explicitly mislead as to Mattel's sponsorship of the works. *See id.*

> ("The song title does not explicitly mislead as to the source of the work; it does not, explicitly or otherwise, suggest that it was produced by Mattel. The *only* indication that Mattel might be associated with the song is the use of Barbie in the title; if this were enough to satisfy this prong of the *Rogers* test, it would render *Rogers* a nullity." (emphasis in original)).

Accordingly, the public interest in free and artistic expression greatly outweighs its interest in potential consumer confusion about Mattel's sponsorship of Forsythe's works.

## B. *Trade dress* [13]

██ Mattel also claims that Forsythe misappropriated its trade dress in Barbie's appearance, in violation of the Lanham Act, 15 U.S.C. § 1125. Mattel claims that it possesses a trade dress in the Superstar Barbie head and the doll's overall appearance. The district court concluded that there was no likelihood that the public would be misled into believing that Mattel endorsed Forsythe's photographs despite Forsythe's use of the Barbie figure.

██ Arguably, the Barbie trade dress also plays a role in our culture similar to the role played by the Barbie trademark—namely, symbolization of an unattainable ideal of femininity for some women. Forsythe's use of the Barbie trade dress, therefore, presumably would present First Amendment concerns similar to those that made us reluctant to apply the Lanham Act as a bar to the artistic uses of Mattel's Barbie trademark in both *MCA* and this case. But we need not decide how the *MCA/Rogers* First Amendment balancing might apply to Forsythe's use of the Barbie trade dress because we find, on a narrower ground, that it qualifies as nominative fair use.[14]

13. Trade dress involves "the total image of a product and may include features such as size, shape, color or color combination, texture, graphics, or even particular sales techniques." *Two Pesos, Inc. v. Taco Cabana, Inc.* 505 U.S. 763, 765 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). *See also Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1258–59 (9th Cir.2001).

14. We have never applied the *Rogers* First Amendment balancing test to trade dress infringement claims. Even if we were to try to balance Mattel's interest in its Barbie trade dress with Forsythe's First Amendment right to use the trade dress in his artistic works, it is not entirely clear whether the *Rogers* balancing test would be apposite. The only Lanham Act claim at issue in *Rogers* was "essentially" a § 1125 "false advertising" claim that the defendant's movie *title* "Ginger and Fred" gave "the false impression that the film is about [Ginger] Rogers and [Fred] Astaire." *Rogers*, 875 F.2d at 1002. *Rogers* did not apply its First Amendment balancing test to—much less, even address—*trade dress;* trade dress was not at issue in that case. *See generally id. See also Cliff's Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*, 718 F.Supp. 1159, 1163 (S.D.N.Y.) ("*Rogers* did not concern the use of a design, or trade dress, registered pursuant to the Lanham Act, but instead dealt with the specific area of titles of literary works."), *vacated*, 886 F.2d 490 (2d Cir.1989). There may be something unique about the use of a trademark in the title of a work that makes non-titular uses of trademarks or trade dress incompatible with the *Rogers* test. *Compare Merriam–Webster,* *Inc. v. Random House, Inc.*, 815 F.Supp. 691, 704 n. 16 (S.D.N.Y.1993) (stating that the injunction of Random House's use of Merriam–Webster's dictionary jacket trade dress "does not implicate artistic expression in a manner analogous to that in [*Rogers* ]"), *vacated on other grounds*, 35 F.3d 65 (2d Cir. 1994), *with Yankee Publ'g*, 809 F.Supp. at 278–82(applying the *Rogers* balancing test to claim by publishers of *The Old Farmer's Almanac* that publisher of *New York* magazine infringed the *Almanac's* trade dress when *New York* styled its 1990 Christmas Gift issue after the *Almanac* ). More importantly, if we were to apply the *Rogers* balancing test, we would have to grapple with First Amendment issues. By instead employing the nominative fair use test—which, incidentally works well in a case like this—we are following the time-honored tradition of avoiding constitutional questions where narrower grounds are available. *See, e.g., Envtl. Def. Ctr., Inc. v. EPA,* 344 F.3d 832, 843 (9th Cir.2003) ("[W]e avoid considering constitutionality if an issue may be resolved on narrower grounds. . . ."). *See also Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 345–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (establishing the rule that it is always prudent to avoid passing unnecessarily on an undecided constitutional question); *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 154–55, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) (stating that federal courts "do not review issues, especially constitutional issues, until they have to"). Thus, we leave the applicability of the Second Circuit's *Rogers* balancing test to trade dress infringement claims for another day.

In the trademark context, we recently held that a defendant's use is *classic* fair use where "a defendant has used the plaintiff's mark *only* to describe his own product, *and not at all to describe the plaintiff's product.*" *Cairns*, 292 F.3d at 1151 (emphasis in original).[15] In contrast, a defendant's use of a plaintiff's mark is *nominative* where he or she "used the plaintiff's mark to describe the plaintiff's product, *even if the defendant's ultimate goal is to describe his own product.*" *Id.* (emphasis in original).[16] The goal of a

nominative use is generally for the "purposes of comparison, criticism[or] point of reference." *New Kids on the Block*, 971 F.2d at 306. These two mutually exclusive forms of fair use are equally applicable here in the trade dress context.[17]

Applying these fair use standards to the trade dress context, we hold that a defendant's use is *classic* fair use where the defendant has used the plaintiff's dress to describe or identify the defendant's own product and not at all to describe or identify the plaintiff's product.[18] Likewise, a

We also need not decide whether Mattel actually has a protectable trade dress in the particular configuration of Barbie features. Generally, to recover for trade dress infringement under § 1125, a plaintiff must show that "its trade dress is protectable and that defendant's use of the same or similar trade dress is likely to confuse consumers." *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987) (quoting *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir. 1987)). A trade dress is protectable if it is "nonfunctional and has acquired secondary meaning and if its imitation creates a likelihood of consumer confusion." *Id.* (quoting *Fuddruckers*, 826 F.2d at 842).

**15.** In *Cairns*, we cited *In re Dual–Deck Video Cassette Recorder Anti-trust Litig.*, 11 F.3d 1460 (9th Cir.1993), as a good example of *classic* fair use of another's trademark. *Cairns*, 292 F.3d at 1151 n. 9.

In [*Dual–Deck Video* ], the defendant sold receivers to which two videocassette recorders could be attached and labeled the relevant terminals on the backs of its machines "VCR–1" and "VCR–2." We concluded that defendant's use of plaintiff's trademark "VCR–2," a descriptive mark that identified plaintiff's two-deck videocassette recorder, was descriptive of defendant's own product. Because defendant used plaintiff's mark in its primary, descriptive sense and in good faith, defendant's use was not an infringement.

*Brother Records, Inc. v. Jardine*, 318 F.3d 900, 906 (9th Cir.2003) (citing *Dual–Deck*, 11 F.3d at 1462, 1467).

**16.** For a good example of *nominative* fair use of another's trademark, see *Cairns*, 292 F.3d

at 1152–53. *See also, e.g., Abdul–Jabbar v. Gen. Motors Corp.*, 85 F.3d 407 (9th Cir.1996) (applying nominative fair use analysis where the defendant automobile manufacture referred to the plaintiff, a basketball star who had won an award three years in a row, in a commercial for a car that also had won an award three years in a row); *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (applying the nominative fair use analysis where automobile repair business specializing in repair of Volkswagens placed sign in front of premises that read "modern Volkswagen Porsche Service"), *as amended*, 413 F.2d 1126 (9th Cir.1969).

**17.** Our *trademark* infringement caselaw is generally applicable to our resolution of Mattel's claim that Forsythe infringed its Barbie *trade dress* because the Supreme Court has clearly stated that trade dress and trademark infringement are very close cousins, both seeking to protect a designation of origin. *Two Pesos*, 505 U.S. at 773, 112 S.Ct. 2753 (stating that " § 43(a) [of the Lanham Act, *codified at* 11 U.S.C. § 1125,] provides no basis for distinguishing between trademark and trade dress.... There is no persuasive reason to apply different analysis to the two...."). Our reluctance to apply the Second Circuit's *Rogers* test to Mattel's trade dress claim stems not from the fact that *Rogers* is a trademark case *per se*. Were the nominative fair use test not available and so attractive to this claim, we very well may have had to apply *Rogers*.

**18.** It is well-established that use of a product feature or trade dress that has become functional will qualify as one form of fair use.

defendant's use is *nominative* where he or she used the plaintiff's dress to describe or identify the plaintiff's product, even if the defendant's ultimate goal is to describe or identify his or her own product.

Forsythe's use of the Barbie trade dress is nominative. Forsythe used Mattel's Barbie figure and head in his works to conjure up associations of Mattel, while at the same time to identify his own work, which is a criticism and parody of Barbie. *See Cairns*, 292 F.3d at 1151. Where use of the trade dress or mark is grounded in the defendant's desire to refer to the plaintiff's product as a point of reference for defendant's own work, a use is nominative.

Fair use may be either nominative or classic. *Id.* at 1150. We recognize a fair use defense in claims brought under § 1125 where the use of the trademark "does not imply sponsorship or endorsement of the product because the mark is used only to describe the thing, rather than to identify its source." *New Kids on the Block*, 971 F.2d at 306. Thus, we recently reiterated that, in the trademark context, nominative use becomes nominative *fair use*[19] when a defendant proves three elements:

> First, the plaintiff's product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the plaintiff's product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*Cairns*, 292 F.3d at 1151 (quoting *New Kids on the Block*, 971 F.2d at 308).

Forsythe's use easily satisfies the first element; his use of the Barbie figure and head are reasonably necessary in order to conjure up the Barbie product in a photographic medium. *See id.* at 1153 ("[T]here is no substitute for Franklin Mint's use of Princess Diana's likeness on its Diana-related products . . . ."). It would have been extremely difficult for Forsythe to create a

---

*Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 164, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).("The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.") "A product feature [or trade dress] is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). Because Mattel's Barbie trade dress is not functional, we are concerned with only whether Forsythe's use of it qualifies as either classic or nominative fair use.

A good example of *classic* fair use of another's trade dress is *Car–Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267 (2d Cir. 1995). In that case, the Second Circuit held that the defendant's sale of a pine-tree-shaped plug-in air freshener was a "fair use" of the pine tree design and did not infringe the plaintiff's rights in its pine tree air freshener design (commonly seen hanging from rear view mirrors). *See id.* at 270. The court held that defendant's use of the pine tree shape for a Christmas season air freshener was intended to call to mind both the scent of the product and the Christmas season. *See id.* According to one of the leading intellectual property commentators, *Car–Freshner* was an "exten[sion] [of] the fair use defense beyond words to the descriptive use of shapes"—*viz.*, trade dress. 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:48, at 11–102 (4th ed.2003). We believe that extension was prudent and look to it for guidance in the resolution of Mattel's trade dress infringement claim.

**19.** The nominative fair use test replaces the traditional *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979), analysis. *Cairns*, 292 F.3d at 1150; *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002).

photographic parody of Barbie without actually using the doll.

Forsythe also satisfies the second element, which requires that a defendant only use so much of a trademark or trade dress as is reasonably necessary. As we recognized in *Cairns*, "[w]hat is 'reasonably necessary to identify the plaintiff's product' differs from case to case." *Id.* at 1154. Where identification "of the defendant's product depends on the description [or identification] of the plaintiff's product, more use of the plaintiff's trademark" or trade dress is reasonably necessary. *Id.* Given the photographic medium and Forsythe's goal of representing the social implications of Barbie, including issues of sexuality and body image, Forsythe's use of the Barbie torso and head is both reasonable and necessary. It would be very difficult for him to represent and describe his photographic parodies of Barbie without using the Barbie likeness.

Though a "closer call than the first two elements" of the nominative fair use analysis, *id.* at 1155, the final element—that the user do nothing that would, in conjunction with use of the mark or dress, suggest sponsorship or endorsement by the trademark or trade dress holder—is satisfied here and weighs in Forsythe's favor. This element does not require that the defendant make an affirmative statement that their product is not sponsored by the plaintiff. *Id.*

Mattel attempts to argue that Forsythe suggested sponsorship by asserting to potential consumers that one of his photographs "hangs on the wall of the office of Mattel's President of Production," to whom Forsythe referred as "Joe Mattel." [20]

One of the purchasers of Forsythe's work apparently told Forsythe that he had given the work to this Mattel senior executive as a gift. Forsythe repeated this fact in certain letters to galleries and friends. Forsythe claims that he had no intention of suggesting sponsorship and that he meant the statement humorously. In virtually every promotional packet in which Forsythe mentioned "Joe Mattel," he also included a copy of his biography in which he identified himself as "someone criticizing Mattel's Barbie and the values for which it stands." The letters in the packets asserted that Forsythe was attempting to "deglamourize[ ] Barbie," "skewer[ ] the Barbie myth," and expose an "undercurrent of dissatisfaction with consumer culture." A similar mission statement was prominently featured on his website.

The rest of the materials in these promotional packets sent to galleries reduce the likelihood of any consumer confusion as to Mattel's endorsement of Forsythe's work. Any reasonable consumer would realize the critical nature of this work and its lack of affiliation with Mattel. Critical works are much less likely to have a perceived affiliation with the original work. *New Kids on the Block*, 971 F.2d at 309(finding no suggested sponsorship in part because a poll in a magazine regarding the popularity of the New Kids asked if the New Kids had become a "turn off").[21]

---

**20.** The record does not clearly establish whether "Joe Mattel" ever existed. Mattel's assertion, however, that " 'Mattel' is not a family name, but a coined word that refers only to Mattel, the company" tends to indicate that "Joe Mattel" is fictitious. In any event, Forsythe claims that he believed that a senior Mattel executive whose first name is "Joe" had one of his works.

**21.** We have also found for the defendant on this factor even in situations where there was some amount of ambiguity. *See Cairns*, 292 F.3d at 1154–56 (finding no suggestion of sponsorship despite an assertion by Franklin Mint in their advertisements that all proceeds

Moreover, even if "Joe Mattel" existed, we question whether possession by a third-party passive recipient of an allegedly infringing work can suggest sponsorship.

We hold that Forsythe's use of Mattel's Barbie qualifies as nominative fair use. All three elements weigh in favor of Forsythe. Barbie would not be readily identifiable in a photographic work without use of the Barbie likeness and figure. Forsythe used only so much as was necessary to make his parodic use of Barbie readily identifiable, and it is highly unlikely that any reasonable consumer would have believed that Mattel sponsored or was affiliated with his work. The district court's grant of summary judgment to Forsythe on Mattel's trade dress infringement claim was, therefore, proper.

C. *Dilution*

 Mattel also appeals the district court's grant of summary judgment on its trademark and dress dilution claims. The district court found that Forsythe was entitled to summary judgment because his use of the Barbie mark and trade dress was parody and thus "his expression is a non-commercial use."

 Dilution may occur where use of a trademark "whittle[s] away . . . the value of a trademark" by "blurring their uniqueness and singularity" or by "tarnishing them with negative associations." *MCA,* 296 F.3d at 903(internal citations omitted). However, "[t]arnishment caused merely by an editorial or artistic parody which satirizes plaintiff's product or its image is not actionable under an anti-dilution statute because of the free speech protections of the First Amendment. . . ." 4 McCarthy, *supra,* § 24:105, at 24–225. A dilution ac-

would go to Diana's charities and its assertion that a Diana porcelain doll is the only *authen-*

tion only applies to purely commercial speech. *MCA,* 296 F.3d at 904. Parody is a form of noncommercial expression if it does more than propose a commercial transaction. *See id.* at 906. Under *MCA,* Forsythe's artistic and parodic work is considered noncommercial speech and, therefore, not subject to a trademark dilution claim.

We reject Mattel's Lanham Act claims and affirm the district court's grant of summary judgment in favor of Forsythe. Mattel cannot use "trademark laws to . . . censor all parodies or satires which use [its] name" or dress. *New Kids on the Block,* 971 F.2d at 309.

**III.**

In light of our holding above that Forsythe's work was transformative, Mattel's remaining state law claims are barred by the First Amendment. *Comedy III Prods., Inc. v. Gary Saderup, Inc.,* 25 Cal.4th 387, 106 Cal.Rptr.2d 126, 21 P.3d 797, 802–11 (Cal.2001) (holding that state law right of publicity claims are "especially worthy of First Amendment protection" when the challenged work "contains significant transformative elements"), *cert. denied,* 534 U.S. 1078, 122 S.Ct. 806, 151 L.Ed.2d 692 (2002).

Mattel also asserts a false advertising claim for the first time on appeal. Mattel did not make this argument to the district court and has, therefore, waived it. *Broad v. Sealaska Corp.,* 85 F.3d 422, 430 (9th Cir.1996), *cert. denied,* 519 U.S. 1092, 117 S.Ct. 768, 136 L.Ed.2d 714 (1997).

Because we affirm the district court's grant of summary judgment in favor of Forsythe and against Mattel on Mattel's copyright and trademark claims, there is

*tic* replica of Diana's famous gown).

no need for us to address the district court's evidentiary rulings appealed by the parties. This aspect of the parties' appeals is moot.

## IV.

Mattel appeals the San Francisco federal district court's decision to quash its Rule 30(b)(6) Subpoena and award attorney's fees to the non-party SFMOMA. We review for abuse of discretion both the decision to quash a subpoena and the decision to award monetary sanctions for abuse of the discovery process. *See Dahl v. City of Huntington Beach*, 84 F.3d 363, 367 (9th Cir.1996) (reviewing for abuse of discretion the decision to award monetary sanctions for discovery abuse); *Premium Serv. Corp. v. Sperry & Hutchinson Co.*, 511 F.2d 225, 229 (9th Cir.1975) (reviewing the decision to quash a subpoena for abuse of discretion). Factual findings underlying a discovery ruling are reviewed for clear error. *See Payne v. Exxon Corp.*, 121 F.3d 503, 507 (9th Cir.1997).

Mattel argues that its Rule 30(b)(6) Subpoena sought "information to impeach [Forsythe's] expert"—presumably Dr. Nickel because the Subpoena was directed at the SFMOMA, Dr. Nickel's employer.[22] It demanded all documents relating to Forsythe and his works and all documents relating to Mattel or Barbie—both topics that admittedly relate to this litigation and Dr. Nickel's expert report and testimony.

But it also demanded all documents relating to the SFMOMA's "policy or practice relating to the third-party copying, reproduction, or photographing" of works in which the SFMOMA had a proprietary interest—a topic that has no bearing on this litigation or on Dr. Nickel. Similarly,

the Subpoena also demanded that the SFMOMA produce a witness or witnesses to testify at deposition on various topics that have no relation to this litigation or to Dr. Nickel. For example, it demanded that the SFMOMA produce a witness or witnesses to testify about the licensing of artworks owned by SFMOMA, including licensed products, royalty rates, and the advertising markets, and sales channels for such products and "the number, identity, nature and results of lawsuits or other legal action taken ... or cease and desist letters sent by" the SFMOMA over the past five years related to reproduction of artwork owned by the SFMOMA.

Because these topics go beyond the scope of impeaching Dr. Nickel, the San Francisco federal district court found that the Subpoena was "very broad"—indeed, "way too broad for the explanation given by [Mattel's counsel]"—and "abusively drawn." The court found that "[n]o attempt had been made to try to tailor the information request to the immediate needs of the case."

The court noted that Mattel had served a virtually identical Rule 30(b)(6) subpoena and document demand on the Guggenheim Museum in New York (the "Guggenheim Subpoena"), the chief curator of which, Lisa Dennison, had prepared a declaration that Forsythe submitted in support of his opposition to Mattel's motion for preliminary injunction. Following service of the Guggenheim Subpoena, Dennison withdrew herself as a percipient witness for trial.

The overbreadth of the SFMOMA Subpoena and the Guggenheim Subpoena and the fact that the two museums' only relation to this litigation was as employers of Forsythe's witnesses led the court to conclude that the two subpoenas were served

---

**22.** Mattel does not specify which defense expert it sought to impeach.

for the purpose of getting the museums to exert pressure on the witnesses not to testify. Thus, the court found that "a pattern is clear in this case that [Mattel's counsel] files these *oppressive* subpoena requests against the employer of anyone who dares to submit a declaration even when it's clear that the declaration says the employer is not speaking for the party." The court concluded that the Subpoena was "served for the purpose of annoying and harassment and not really for the purpose of getting information."

Furthermore, as the SFMOMA argues, by asking it to provide information on "the market for Forsythe's works at issue in the [Los Angeles federal district court] action, including the characteristics of 'art consumers,'" Mattel appeared to be seeking "expert" testimony. As the 1991 amendment notes to Federal Rule of Civil Procedure 45 states, Rule 45(c)(3)(B)(ii) was intended to provide "appropriate protection for the intellectual property of non-party witness.... A growing problem has been the use of subpoenas to compel the giving of evidence and information by un-retained experts." Fed.R.Civ.P. 45 1991 amend. note.

Rule 45 provides that the court from which the subpoena was issued "shall quash or modify the subpoena if it ... subjects a person to undue burden." Fed. R.Civ.P. 45(c)(3)(A)(iv). Given the intended protections of the Rule and Mattel's violation of those protections, we find that the San Francisco federal district court did not abuse its discretion by quashing Mattel's subpoena, and its factual findings do not display clear error.

We also affirm the San Francisco federal district court's award of attorney's fees. As Rule 45(c)(1) states, "[t]he court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to ... a reasonable attorney's fee." Fed.R.Civ.P. 45(c)(1).

Given the San Francisco federal district court's justified finding that the subpoena was overly burdensome and served for an improper purpose, the court did not abuse its discretion in awarding fees and expenses to the SFMOMA's counsel as a sanction under Rule 45(c).

## V.

On cross-appeal, Forsythe appeals the Los Angeles federal district court's decision to deny attorney's fees under the Lanham and Copyright Acts. We review the district court's refusal to award fees for abuse of discretion. *See Yount v. Acuff Rose–Opryland,* 103 F.3d 830, 836 (9th Cir.1996). *See also Rolex Watch, U.S.A., Inc. v. Michel Co.,* 179 F.3d 704, 711 (9th Cir.1999). Any legal analysis or statutory interpretation, however, is reviewed de novo. *See Entm't Research Group, Inc. v. Genesis Creative Group, Inc.,* 122 F.3d 1211, 1216 (9th Cir.1997), *cert. denied,* 523 U.S. 1021, 118 S.Ct. 1302, 140 L.Ed.2d 468 (1998).

In assessing whether attorney's fees under the Copyright Act were appropriate, the district court held that

> the Defendants have not demonstrated that the award of $1.6 million dollars in fees and expenses would further the purposes of the Copyright Act, that plaintiff's case was frivolous or objectively unreasonable, or that the need to advance considerations of compensation and deterrence supports an award.

Assessing whether attorney's fees were appropriate under the Lanham Act, the district court held that "[d]efendants have not demonstrated that this is an exceptional case, such that the Court can in its

discretion award attorneys' fees under the Lanham Act."

Forsythe argues that the district court failed to provide sufficient justification for its denial of attorney's fees to satisfy the Requirements of Rule 52(a).[23] To comply with Rule 52(a):

> Statements conclusory in nature are to be eschewed in favor of statements of the preliminary and basic facts on which the district court relied. Otherwise, their findings are useless for appellate purposes. The findings must be explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision.

*Unt v. Aerospace Corp.*, 765 F.2d 1440, 1444 (9th Cir.1985) (citations omitted).

■■■ Generally, a district court's order on attorney's fees may be set aside if the court fails to state reasons for its decision or applies the incorrect legal standard. *See Smith v. CMTA–IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir.1984) ("If the district court fails to state the reasons for its decision a remand for a statement of reasons may be necessary."). *See also EEOC v. Bruno's Rest.*, 13 F.3d 285, 288 (9th Cir.1993) ("The court's conclusory finding is not the detailed explanation that circuit courts require for effective review."); *Stewart v. Gates*, 987 F.2d 1450, 1454 (9th Cir.1993) ("[A]bsent some indication of how the district court's discretion was exercised [with respect to the attorney's fee motion], [the appellate] court has no way of knowing whether that discretion was abused." (internal cite omitted)). We have reversed a district court's grant of attorney's fees in a copyright case where the court:

did not make a finding concerning the basis for the award. of attorney's fees. Thus. we do not know what motivated the district court to award fees. For that reason we reverse and remand this issue to the district court to make an express finding as to the basis for the award of attorney's fees.

*McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 323(9th Cir.1987), *disagreed with on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 525–26, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). Where the district court fails to provide reasoning for its conclusions, however, we will only remand if the record does not support the district court's decision. *See Bruno's Rest*, 13 F.3d at 288 ("However, when a court does not enter a specific finding of fact or conclusion of law, we will uphold the result if there is a reasonable view of the record to support it.").

The court here failed to provide any reasoning for its conclusions and, as explained below, we conclude that the record did not support the court's conclusions. Accordingly, we vacate and remand to the district court to reconsider its denial of attorney's fees under both Acts.

A. *Fees under the Copyright Act*

The district court's decision indicates that it may have erred in its legal analysis of the appropriateness of fees under the Copyright Act. We review this possible error de novo. *See Entm't Research Group*, 122 F.3d at 1216(holding that a district court's legal analysis or statutory interpretation are reviewed de novo).

■■■ As noted above, the district court concluded that "[d]efendants have not demonstrated that the award of $1.6 million dollars in fees and expenses would

---

**23.** Rule 52(a) requires that the court "shall find the facts specially and state separately its conclusions of law" on motions for attorneys' fees. *See* Fed.R.Civ.P. 52(a).

further the purposes of the Copyright Act." Forsythe correctly points out that this sentence appears to misstate the law. Under the Copyright Act, the question is whether a successful *defense* of the action furthered the purposes of the Act, not whether a *fee award* would do so. *See Fogerty,* 510 U.S. at 527, 114 S.Ct. 1023. The district court appears to have decided that the fee award itself would not further the purposes of the act. Instead of denying fees outright, the court should have reduced the amount of the requested fee, if appropriate. *See Frank Music Corp. v. Metro–Goldwyn–Mayer Inc.,* 886 F.2d 1545, 1556–57(9th Cir.1989), *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990). Because the district court may have applied an incorrect legal analysis, we vacate and remand for reconsideration of whether to award fees under the Copyright Act.

### B. *Fees under the Lanham Act*

 The Lanham Act allows for an award of attorney's fees in "exceptional cases." 15 U.S.C. § 1117(a). *See also McClaran v. Plastic Indus., Inc.,* 97 F.3d 347, 364 (9th Cir.1996). Fees under the Lanham Act are appropriate "[w]hen a plaintiff's case is groundless, unreasonable, vexatious, or pursued in bad faith." *Stephen W. Boney, Inc. v. Boney Servs., Inc.,* 127 F.3d 821, 827 (9th Cir.1997).

Analysis of Mattel's trademark and trade dress infringement claims indicates that Mattel's claims may have been groundless or unreasonable. Forsythe's use constituted nominative fair use and was protected by policy interests in free expression. Given the lack of reasoning provided by the district court, we vacate and remand its denial of attorney's fees and direct it to reassess the propriety of awarding Lanham Act fees to Forsythe.

## CONCLUSION

We AFFIRM the Los Angeles federal district court's grant of Forsythe's summary judgment motion as to Mattel's copyright, trademark and trade dress infringement and dilution, and state law claims. We also AFFIRM the San Francisco federal district court on its decision to quash Mattel's Subpoena and to grant the nonparty SFMOMA attorney's fees.

On cross-appeal, we VACATE and RE-MAND the Los Angeles federal district court's decision to deny Forsythe attorney's fees under the Lanham and Copyright Acts.

All costs on appeal taxed against Mattel. *See* Fed. R.App. P. 39(a)(4).