[No. H036253. Sixth Dist. Oct. 24, 2012.]

WINCHESTER MYSTERY HOUSE, LLC, Plaintiff and Appellant, v.
GLOBAL ASYLUM, INC., Defendant and Respondent.

582

COUNSEL

Hopkins & Carley, Eugene Ashley, Allonn E. Levy; Loeb & Loeb, Saul D. Brenner and Melanie Howard for Plaintiff and Appellant.

Scott A. Meehan for Defendant and Respondent.

OPINION

**MIHARA, J.**—After defendant Global Asylum, Inc., released its film Haunting of Winchester House (2009), plaintiff Winchester Mystery House, LLC, filed an action alleging unauthorized use of its trademarks (15 U.S.C. § 1114), unfair competition (15 U.S.C. § 1125(a)), and interference with contract and economic advantage. Defendant brought a motion for summary judgment, which the trial court granted. On appeal, plaintiff contends that the trial court improperly reached a constitutional issue because it failed to engage in the threshold inquiry as to whether plaintiff's trademarks have become an integral part of the public's vocabulary. Plaintiff also contends that even if the constitutional issue was properly reached, the trial court erred in its application of the test set forth in *Rogers v. Grimaldi* (2d Cir. 1989) 875 F.2d 994 (*Rogers*). Plaintiff further asserts that there were triable issues of material fact in connection with its causes of action for interference with contract and economic advantage. We conclude that the trial court properly granted the motion for summary judgment and affirm.

## I. Statement of Facts[1]

Plaintiff is a privately owned company that owns and operates the Winchester Mystery House. The Winchester Mystery House is a popular tourist attraction that consists of the Winchester mansion, surrounding gardens, a museum, a gift shop, a cafe, and a business conference center. Defendant produces and distributes films.

The Winchester Mystery House is known as the mansion built by Sarah Winchester. After Sarah and William Winchester were married, they had a daughter who died shortly after her birth. When William died in 1881, he left his wife a substantial interest in the Winchester Repeating Arms Company. It is popularly believed that a psychic medium told Sarah Winchester in 1884

---

[1] The statement of facts is based on plaintiff's statement of undisputed material facts and the supporting evidence that was not excluded by the trial court.

that her family was cursed by the spirits of those who had been killed by the Winchester rifle. Based on the medium's advice, Sarah Winchester moved to California and bought a farmhouse in what is now San Jose. She then began renovating and adding more rooms to the house. The construction continued 24 hours a day, seven days a week, 365 days a year for the next 38 years, and only stopped when she died in 1922. This work resulted in a 160-room Victorian-style mansion, which was known as Llanada Villa.

John Brown and Mayme Brown later purchased the house, established a museum, and opened the grounds to guests for a fee. In 1998, the Browns' descendants formed Winchester Mystery House, LLC.

Plaintiff's brand includes the Winchester Mystery House word mark and the architectural mark that consists of the three-dimensional design of the Winchester mansion (collectively, the marks). The marks have been registered with the United States Patent and Trademark Office since February 2010. Plaintiff's marketing efforts include a billboard campaign, a Web site, advertisements on radio and in magazines, and the distribution of brochures. The Winchester Mystery House has been publicized in local, state, national, and international newspapers. It has also been publicized in documentaries and television shows.

In 2008, plaintiff entered into an agreement with Imagination Design Works, Inc. (IDW), for use of the Winchester Mystery House site as a location for the filming and production of a movie. Under this agreement, plaintiff granted IDW exclusive rights to the use of the Winchester Mystery House property and grounds as a filming location as well as rights for the use of certain Winchester Mystery House trademarks and copyrights relating to the Winchester Mystery House property and history.

In April 2009, Andrew Trapani, who produced The Haunting in Connecticut (Lionsgate 2009) and is affiliated with IDW, was asked in an interview what his future plans were. He referred to some projects and then stated: "The last one, which I really wish I could tell you the title of, but we're still dotting i's and crossing t's, is on a very well known haunted house. We're coming to terms on doing the first movie ever based on this house." He did not refer to the Winchester Mystery House by name.

On June 1, 2009, plaintiff received an e-mail from Courtney Wells, defendant's production coordinator, which requested filming location rates for use of the Winchester Mystery House property for a "low budget haunted house/ghost story movie" that was to begin production on June 13. The

following day, plaintiff's general manager sent an e-mail to Wells that stated: "Thank you for your interest in the beautiful, but bizarre Winchester Mystery House. The Winchester Mystery House just signed a contract with another company for the exclusive rights to the Winchester story. I am unable to give further details at this time."

On July 1, 2009, through a joint press release, plaintiff and IDW announced that a "Major Hollywood Feature-Film" on the Winchester Mystery House and produced by Trapani would begin filming by the end of the year. The press release also stated that this would be "the first film granted permission to shoot on location."

In late July 2009, plaintiff learned that defendant had posted on its Web site an announcement that it was producing a film with the title "Haunting of Winchester House." On July 31, 2009, plaintiff sent a letter to defendant regarding possible infringement of plaintiff's marks. On September 4, 2009, plaintiff sent a second letter, which stressed plaintiff's objection to defendant's use of any unauthorized footage of the Winchester Mystery House. Though plaintiff noted that it had previously granted the right to film the Winchester Mystery House to other production companies, it did not refer to its contract with IDW.

Plaintiff later obtained a DVD copy of defendant's film. The front cover of the DVD jacket features the title "HAUNTING OF WINCHESTER HOUSE," and states that it is a "A MARK ATKINS Film" and that it is "THE TERRIFYING TRUE STORY." The cover also includes a depiction of a Victorian-style structure. The back jacket cover states: "A family moves into the 160 room mansion to act as caretakers, but when a malevolent force abducts their daughter they discover why the house deserves its reputation as one of the most haunted places in America." It also states that "THE ASYLUM presents . . . a MARK ATKINS film." The cover art does not contain the phrases "Winchester Mystery House" or "Winchester Mystery House, LLC." The DVD itself includes the title and the image of the Victorian-style structure.

The movie begins with a shot of the Victorian-style structure, which is not the actual Winchester Mystery House. The plot of the movie includes the ghost characters of Sarah Winchester, her adolescent daughter, and her brother who was deaf and could not speak. These characters as well as the ghosts of those killed by Winchester weapons haunt Sarah Winchester's home. The historical figure Sarah Winchester did not have an adolescent daughter or a brother who was deaf and could not speak.

## II. Statement of the Case

On April 29, 2010, plaintiff filed a first amended complaint that alleged seven causes of action. At issue in the present appeal are the causes of action for trademark infringement, unfair competition, intentional interference with contractual relations, and interference with economic advantage and prospective economic advantage. The first cause of action for trademark infringement (15 U.S.C. § 1114) alleged that defendant's use of "Winchester House" and the images of the Victorian-style mansion in its film and in the distribution and advertising of its film caused confusion in the minds of the public, leading them to believe that plaintiff approved, sponsored, or associated itself with defendant. The second cause of action for unfair competition (15 U.S.C. § 1125) alleged that defendant intentionally and unlawfully exploited plaintiff's marks and consumer goodwill for its own benefit, and that defendant's use of the marks was likely to cause confusion as to sponsorship or approval of defendant with plaintiff. The fifth cause of action for intentional interference with contract alleged plaintiff licensed certain rights for use of the marks to IDW in 2008; defendant knew of the agreement in June 2009; and defendant intended to, and did, disrupt the performance of the agreement by its unauthorized use of "Winchester House" and the images of the mansion. The sixth cause of action for interference with economic advantage and prospective economic advantage essentially repeated the allegations in the fifth cause of action. Plaintiff sought damages and injunctive relief.

Defendant filed a motion for summary judgment or, in the alternative, summary adjudication. Defendant argued that the First Amendment provided an absolute defense to the trademark/unfair competition claims and the "[n]ominal [f]air [u]se [d]octrine" allowed defendant to identify plaintiff's marks in the context of describing the movie. Defendant also argued that there was no evidence that defendant intended to interfere with plaintiff's contract with IDW. Plaintiff responded that the First Amendment defense did not support defendant's motion and that there were disputed material facts.

After the trial court granted the motion for summary judgment, plaintiff filed a timely appeal.

## III. Discussion

### A. Standard of Review

A party who brings a motion for summary judgment bears the burden of persuasion that there are no triable issues of material fact and that the moving party is entitled to judgment as a matter of law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).)

A defendant may be entitled to judgment as a matter of law where "[o]ne or more of the elements of the cause of action cannot be separately established" or there is "an affirmative defense to that cause of action." (Code Civ. Proc., § 437c, subd. (*o*)(1), (2).) After the defendant meets this burden, the burden shifts to the plaintiff to show that a genuine issue of material fact exists. (Code Civ. Proc., § 437c, subd. (p)(2).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850.) This court reviews a ruling on a summary judgment motion de novo. (*McGuan v. Endovascular Technologies, Inc.* (2010) 182 Cal.App.4th 974, 981 [106 Cal.Rptr.3d 277].)

### B. Causes of Action for Trademark Infringement and Unfair Competition

In opposing the motion for summary judgment below, plaintiff argued that defendant had failed to establish that it was entitled to judgment as a matter of law under the two-pronged test of *Rogers, supra*, 875 F.2d 994. At that time, plaintiff also noted that the *Rogers* test was adopted by the Ninth Circuit in *Mattel, Inc. v. MCA Records, Inc.* (9th Cir. 2002) 296 F.3d 894 (*MCA*). Relying on *MCA* and its progeny, plaintiff now argues for the first time on appeal that the trial court erred by applying the *Rogers* test without engaging "in the necessary threshold analysis of whether [plaintiff's] marks had transcended their source-identifying purpose as trademarks and become an integral part of the public discourse, thus taking on an *expressive* function."

■ "The Lanham Act provides for the registration of trademarks, which it defines in § 45 to include 'any word, name, symbol, or device, or any combination thereof [used or intended to be used] to identify and distinguish [a producer's] goods . . . from those manufactured or sold by others and to indicate the source of the goods . . . . ' 15 U. S. C. § 1127. Registration of a mark under § 2 of the Lanham Act, 15 U. S. C. § 1052, enables the owner to sue an infringer under § 32, 15 U. S. C. § 1114 . . . . In addition to protecting registered marks, the Lanham Act, in § 43(a), gives a producer a cause of action for the use by any person of 'any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods . . . .' 15 U. S. C. § 1125(a)." (*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.* (2000) 529 U.S. 205, 209 [146 L.Ed.2d 182, 120 S.Ct. 1339].) ■ The use of a trademark is "the owner's way of preventing others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner. A trademark 'informs people that trademarked products come from the same

source.' [Citation.]" (*MCA, supra,* 296 F.3d at p. 900.) However, the First Amendment provides a complete defense to the Trademark Act of 1946 (15 U.S.C. § 1051 et seq.) (the Lanham Act) claims involving artistic works in some cases. (*E.S.S. Entertainment 2000 v. Rock Star Videos* (9th Cir. 2008) 547 F.3d 1095, 1099–1101.) At issue in the present case is whether the First Amendment is a defense to plaintiff's claims for trademark infringement (15 U.S.C. § 1114) and unfair competition (15 U.S.C. § 1125(a)).

■ In considering the degree to which First Amendment concerns narrowed the scope of the Lanham Act as applied to the title of a movie, the Second Circuit developed the *Rogers* test. In *Rogers*, the plaintiff, Ginger Rogers, brought an action against the producers and distributors of a movie "Ginger and Fred" for, among other things, a violation of 15 United States Code section 1125(a). (*Rogers, supra,* 875 F.2d at pp. 996–997.) Since the movie depicted the televised reunion of two fictional performers who had once imitated Rogers and Fred Astaire in their cabaret act, the plaintiff argued that the title misled movie viewers to believe that film was about her or that she sponsored or endorsed the film. (*Id.* at p. 997.) *Rogers* recognized that though films are "works of artistic expression and deserve protection" under the First Amendment, "they are also sold in the commercial marketplace, . . . making the danger of consumer deception a legitimate concern that warrants some government regulation." (875 F.2d at p. 997.) *Rogers* also observed that the titles of films, "like the artistic works they identify, are of a hybrid nature, combining artistic expression and commercial promotion." (*Id.* at p. 998.) Thus, *Rogers* concluded that the Lanham Act "should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." (875 F.2d at p. 999.) Regarding an allegedly misleading title, *Rogers* held that the Lanham Act would not apply "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." (875 F.2d at p. 999.) After applying this test, *Rogers* concluded that the plaintiff did not have a claim for the use of her name in the title of the film. (*Id.* at pp. 1001–1002.)

The parties have focused on the Ninth Circuit's use of the *Rogers* test. In *MCA, supra,* 296 F.3d 894, the plaintiff, the toy manufacturer that created Barbie, brought trademark claims against the music companies who produced, marketed, and sold the song "Barbie Girl." (*Id.* at p. 899.) In part IIIA. of the opinion, *MCA* observed that the "likelihood-of-confusion test, see *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (1979), generally strikes a comfortable balance between the trademark owner's property rights and the public's expressive interests. But when a trademark owner asserts a right to control how we express ourselves—when we'd find it difficult to describe the product any other way (as in the case of aspirin), or when the mark (like

Rolls Royce) has taken on an expressive meaning apart from its source-identifying function—applying the traditional test fails to account for the full weight of the public's interest in free expression." (*Id.* at p. 900.) *MCA* continued: "Simply put, the trademark owner does not have the right to control public discourse whenever the public imbues his mark with a meaning beyond its source-identifying function. [Citation.]" (*Ibid.*) In part IIIB. of the opinion, *MCA* focused on the use of a trademark in a title. *MCA* recognized that "[c]onsumers expect a title to communicate a message about the book or movie, but they do not expect it to identify the publisher or producer. . . . If we see a painting titled 'Campbell's Chicken Noodle Soup,' we're unlikely to believe that Campbell's has branched into the art business." (*MCA*, at p. 902, citation omitted.) *MCA* concluded its analysis on the use of trademarks in titles by adopting the *Rogers* test. (*Ibid.*)

The following year, Barbie was again the topic of litigation in *Mattel, Inc. v. Walking Mountain Productions* (9th Cir. 2003) 353 F.3d 792 (*Walking Mountain*). In that case, the plaintiff brought a trademark infringement claim against a photographer who produced and sold photographs of a nude Barbie in various positions with vintage household appliances. (*Id.* at p. 796.) Relying on *MCA, Walking Mountain* states that "[w]here a mark assumes such cultural significance, First Amendment protections come into play" and then concludes: "As we determined in *MCA*, Mattel's 'Barbie' mark has taken on such a role in our culture." (*Id.* at p. 807.) After applying the *Rogers* test, *Walking Mountain* found no trademark infringement. (*Ibid.*)

More recently, *Rebelution, LLC v. Perez* (N.D.Cal. 2010) 732 F.Supp.2d 883 (*Rebelution*) considered application of the *Rogers* test. In that case, the plaintiff, a reggae band, brought a trademark action against various defendants, including the musician Pitbull, who used the word "rebelution" in the title of one of his albums. (*Id.* at pp. 885–886.) Relying on *MCA* and *Walking Mountain*, the court stated: "The Ninth Circuit has adopted the *Rogers* test, however, it has placed an important limitation upon its application: plaintiff's mark must be of such cultural significance that it has become an integral part of the public's vocabulary." (*Id.* at p. 887.) Thus, *Rebelution* concluded that the *Rogers* test did not apply and that the defendants could not prevail under the likelihood of confusion test. (*Id.* at pp. 888, 890–899.)

Plaintiff argues that its marks have not become "cultural icons or terms of cultural significance" or "integral to the public discourse," and they continue to function as source identifiers for the goods and services that it offers, and thus no First Amendment rights are implicated. Therefore, plaintiff urges this court to apply the "likelihood of confusion" test.

This court is " 'not bound by a federal circuit court opinion. [Citation.] In the absence of a controlling United States Supreme Court decision

on a federal question, we are free to make an independent determination of law.' [Citations.] ' "Where the federal circuits are in conflict, the decisions of the Ninth Circuit are entitled to no greater weight than those of other circuits." [Citation.]' [Citation.]" (*Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 468 [125 Cal.Rptr.2d 534].) Thus, regardless of whether the Ninth Circuit applies the *Rogers* test only when the trademark is "iconic," we are persuaded that the *Rogers* test is appropriate in the present case.

 Here, plaintiff's marks identify not only a world famous tourist attraction, but also the property of its former eccentric owner. There was an actual Sarah Winchester, who, according to legend, created a Victorian-style mansion to fend off ghosts. A film that is based on a "true" story will inevitably have a more powerful impact on those who enjoy ghost or horror films. Thus, defendant has used "Winchester House" in its title and a Victorian-style mansion on its DVD cover, which are similar to plaintiff's marks, and created a fictional work based on the historical figure Sarah Winchester and her allegedly haunted mansion. In our view, where marks have historical significance and similar marks are used in the title of an artistic work or advertising, the *Rogers* test adequately ensures protection of both the public interest in avoiding consumer confusion and the public interest in free expression.[2]

 The first prong of the *Rogers* test requires only that the title pass "the appropriately low threshold of minimal artistic relevance" to the content of the film. (*Rogers, supra*, 875 F.2d at p. 999.) Here, both the title "Haunting of Winchester House" and the Victorian-style mansion on the DVD cover have some artistic relevance to the underlying work. Caretakers move into the house built by Sarah Winchester, and her ghost and the ghosts of those killed by Winchester weapons are characters in the film. Plaintiff has conceded that the title of the film and its setting were meant to reference the house built by Sarah Winchester. Though plaintiff has disputed that Sarah Winchester had an adolescent daughter and a brother who was deaf and could not speak, defendant's use of both fiction and history does not render its artistic work

---

[2] Relying on *Tri-Star Pictures, Inc. v. Unger* (S.D.N.Y. 1998) 14 F.Supp.2d 339 (*Tri-Star*) and *Lutz v. De Laurentiis* (1989) 211 Cal.App.3d 1317 [260 Cal.Rptr. 106] (*Lutz*), plaintiff argues that courts have found trademark infringement and unfair competition "even in instances in which the challenged title referenced an historical location or event." However, the defendants in both *Tri-Star* and *Lutz* attempted to use movie titles that were similar to previously released films. *Rogers* recognized that its test "would not apply to misleading titles that are confusingly similar to other titles. The public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles." (*Rogers, supra*, 875 F.2d at p. 999, fn. 5.) Here, defendant has not produced a film with a "confusingly similar" title. Therefore, these cases do not provide guidance to resolution of the issue before us.

outside protection by the First Amendment under the *Rogers* test. (*Seale v. Gramercy Pictures* (E.D.Pa. 1996) 949 F.Supp. 331, 333–334, 339–340.)

However, relying on *Parks v. LaFace Records* (6th Cir. 2003) 329 F.3d 437, plaintiff argues that the present case fails to satisfy the "artistic relevance" prong of the *Rogers* test as a matter of law. In *Parks*, the civil rights icon Rosa Parks brought an action under the Lanham Act against, among others, the musical duo Outkast and their record producer for using her name in the title of a song. (329 F.3d at p. 441.) Though the lyrics of the song did not contain any reference to Rosa Parks or her persona, the hook or chorus contained the phrase "move to the back of the bus." (*Id.* at pp. 442–443.) The defendants argued that "the historical association between Rosa Parks and the phrase 'move to the back of the bus' is beyond dispute and that Parks' argument that the song is not 'about' her in a biographical sense is simply irrelevant." (*Id.* at p. 452.) The Sixth Circuit observed that the phrase, when considered with the song's other lyrics, had "absolutely nothing to do with Rosa Parks." (*Ibid.*) One of the defendants supported this interpretation by admitting: " 'We (Outkast) never intended for the song to be about Rosa Parks or the civil rights movement. It was just symbolic, meaning that we comin' back out, so all you other MCs move to the back of the bus.' " (*Ibid.*) Since the lyrics were not about Rosa Parks and the defendants never intended them to be about Rosa Parks, the Sixth Circuit concluded that there was a triable issue of material fact as to whether "the use of Rosa Parks' name as a title to the song and on the cover of the album [was] artistically related to the content of the song or whether the use of the name Rosa Parks [was] nothing more than a misleading advertisement for the sale of the song." (*Id.* at p. 458.) In contrast to *Parks*, here, both the title "Haunting of Winchester House" and the Victorian-style mansion are related to the content of the film.

Plaintiff contends that the evidence in the case before us was uncontroverted that defendant decided to use plaintiff's marks in the title and in packaging its film as "merely a crass marketing tool, not an artistic decision based upon the subject matter" of the film. To support this claim, plaintiff relies on the deposition testimony of Paul Bales, defendant's officer and director, who was asked: "[Y]ou could have told the story without relating it to The Winchester House, couldn't you?" He responded, "We could have, but as I indicated in the beginning, we found that a true story increases interest . . . in the film . . . ." However, this evidence does not create a triable issue of material fact as to whether the choice of the title and the packaging of the film had some artistic relevance to the film. As *Rogers* recognized, "[t]he artistic and commercial elements of titles are inextricably intertwined." (*Rogers, supra*, 875 F.2d at p. 998.) That defendant based its film on a true story to generate interest does not mean that the title and the cover of the DVD were not artistically relevant to the underlying film.

Relying on *Rebelution, supra,* 732 F.Supp.2d at page 889, plaintiff also argues that "[t]o satisfy its burden of proving 'artistic relevance,' a defendant is required to demonstrate that its use of a plaintiff's trademark refers to the meaning associated with the *plaintiff's mark.*" Even assuming that *Rebelution* correctly stated the *Rogers* test, defendant's use of plaintiff's marks refers to the meaning associated with plaintiff's marks, that is, the house built by Sarah Winchester to fend off the ghosts of those killed by Winchester weapons.

Plaintiff's reliance on *American Dairy Queen Corp. v. New Line Productions* (D.Minn. 1998) 35 F.Supp.2d 727 (*Dairy Queen*) is similarly misplaced. In *Dairy Queen,* the plaintiff was the owner of "several thousand family-oriented retail outlets, selling frozen dairy treats and other food." (*Id.* at p. 729.) The plaintiff sought an injunction barring the defendant filmmaker from using the title " 'Dairy Queens' " in its film, claiming trademark infringement. (*Id.* at p. 728.) The film satirized "beauty contests in rural Minnesota" and "portray[ed] these contests as filled with backbiting and jealousy, and suggest[ed] the participants tend to suffer from eating disorders." (*Id.* at pp. 728–729.) The film did not refer to the plaintiff's restaurants or frozen dairy treats. (*Id.* at p. 729.) *Dairy Queen* applied the alternative avenues test and concluded that there was no violation of First Amendment interests because there were alternative ways of expressing the defendant's ideas. (35 F.Supp.2d at p. 734.) *Dairy Queen* also distinguished *Rogers, supra,* 875 F.2d 994, noting that the defendant denied any reference to the plaintiff's restaurants or products in its use of the title " 'Dairy Queens.' " (*Dairy Queen,* at p. 734.) In contrast to *Dairy Queen,* here the title and the image of the Victorian-style mansion refer to Sarah Winchester's house, which is currently owned by plaintiff.

Accordingly, we reject plaintiff's arguments and conclude that defendant has satisfied the first prong of the *Rogers* test.

■ Turning to the second prong of *Rogers,* the title and the cover of the DVD do not "explicitly mislead[] as to the source or content of the work." (*Rogers, supra,* 875 F.2d at p. 999.) There is no suggestion that the film was authorized, endorsed, or produced by plaintiff. The cover art to the film does not contain the phrase "Winchester Mystery House" or "Winchester Mystery House, LLC." Instead, "A MARK ATKINS Film" is featured above the title on the front cover. The back cover states: "[Defendant] presents a MARK ATKINS film HAUNTING OF WINCHESTER HOUSE." Defendant's use of plaintiff's marks also does not explicitly mislead as to the content of the film. As previously stated, the film's setting is the house built by Sarah Winchester and it is haunted by the ghosts associated with her. Thus, defendant has satisfied the second prong of the *Rogers* test.

Plaintiff also contends that the trial court failed "to recognize the material differences between trademark rights and rights of publicity . . . prompting the court to assume incorrectly that the original formulation of the *Rogers* test—which was created for right of publicity cases—is equally applicable to the trademark context." (Fns. omitted.) Plaintiff is mistaken in its characterization of *Rogers*. Though the plaintiff in *Rogers* brought a common law right of publicity, her complaint also alleged that the defendants "violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982), by creating the false impression that the film was about her or that she sponsored, endorsed, or was otherwise involved in the film." (*Rogers, supra*, 875 F.2d at p. 997.) The plaintiff also asserted that she had given a license to a third party to produce a line of lingerie and she hoped to publish and sell her autobiography for adaptation as a film. (*Id.* at p. 996.) It was in this context that *Rogers* discussed the scope of the Lanham Act. Similarly, here, plaintiff's second cause of action for unfair competition is based on a violation of 15 United States Code section 1125(a).[3]

Plaintiff next contends that "it is unclear whether California courts would adopt *Rogers* as the appropriate framework for assessing a First Amendment defense to any type of claim, including trademark infringement and unfair competition." The cases upon which it relies are distinguishable from the present case. In *No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018 [122 Cal.Rptr.3d 397] (*No Doubt*), one of the issues was whether the defendant had misappropriated the images of the band No Doubt in its video game. *No Doubt* declined to adopt the *Rogers* test, noting that "[a]lthough the 'explicitly misleading' requirement of the *Rogers* test makes obvious sense when the title of an artistic work is at issue, and thus conventional 'speech' is involved, we question whether it should apply when the actionable wrong is the misappropriation of a celebrity's likeness in a video game." (*Id.* at p. 1039, fn. 8.) In contrast to *No Doubt*, conventional speech is involved in the present case.

Plaintiff's reliance on *Allied Artists Pictures Corp. v. Friedman* (1977) 68 Cal.App.3d 127 [137 Cal.Rptr. 94] and *Metro-Goldwyn-Mayer, Inc. v. Lee* (1963) 212 Cal.App.2d 23 [27 Cal.Rptr. 833] is also misplaced. First, these cases were decided prior to *Rogers*. Second, the *Rogers* test would not have applied because both cases involved "misleading titles that are confusingly similar to other titles." (*Rogers, supra*, 875 F.2d at p. 999, fn. 5.)

Relying on *Twin Peaks v. Publications Intern.* (2d Cir. 1993) 996 F.2d 1366, 1379–1380 (*Twin Peaks*), plaintiff also argues that the trial court erred

---

[3] In cases in which no First Amendment concerns are at issue, the tests for trademark infringement, unfair competition, and false designation of origin under the Lanham Act are identical. (*New West Corp. v. NYM Co. of California, Inc.* (9th Cir. 1979) 595 F.2d 1194, 1201.)

by failing to recognize that post-*Rogers* decisions have incorporated the "likelihood of confusion" test into the second prong of the *Rogers* test.

■ Since plaintiff did not argue this theory before the trial court, we requested supplemental briefing on whether the issue had been forfeited. Plaintiff correctly points out that when an appeal raises a question of law on undisputed facts, the issue has not been forfeited. (*C9 Ventures v. SVC-West, L.P.* (2012) 202 Cal.App.4th 1483, 1492 [136 Cal.Rptr.3d 550].) However, this "court can deem an argument raised in an appeal from a grant of summary judgment waived if it was not raised below and requires consideration of new factual questions." (*Zimmerman, Rosenfeld, Gersh & Leeds LLP v. Larson* (2005) 131 Cal.App.4th 1466, 1488 [33 Cal.Rptr.3d 111].) " 'It would be manifestly unjust to the opposing parties, unfair to the trial court, and contrary to judicial economy to permit a change of theory on appeal.' " (*Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 873 [36 Cal.Rptr.3d 515], quoting *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 28–29 [21 Cal.Rptr.2d 104].)

■ The likelihood of confusion test is set forth in *AMF Inc. v. Sleekcraft Boats, supra,* 599 F.2d 341 (*Sleekcraft*), abrogated in part on other grounds in *Walking Mountain, supra,* 353 F.3d 792. *Sleekcraft* stated: "When the goods produced by the alleged infringer compete for sales with those of the trademark owner, infringement usually will be found if the marks are sufficiently similar that confusion can be expected. When the goods are related, but not competitive, several other factors are added to the calculus. If the goods are totally unrelated, there can be no infringement because confusion is unlikely." (*Sleekcraft,* at p. 348, fns. omitted.) Under this test, courts consider eight factors: the strength of the mark; the relatedness of the goods; the similarity of the mark; the evidence of actual confusion; the marketing channels used; the type of goods and the likely degree of care by the purchaser; the defendant's intent in selecting the mark; and the likelihood of expansion of the product lines.[4] (*Sleekcraft,* at pp. 348–349.) Likelihood of confusion is a factual determination. (*Nutro Products, Inc. v. Cole Grain Co.* (1992) 3 Cal.App.4th 860, 868, fn. 1 [5 Cal.Rptr.2d 41]; *Society of Financial Examiners v. National Assn. of Certified Fraud Examiners* (5th Cir. 1995) 41 F.3d 223, 225.) In trademark infringement cases involving First Amendment concerns, "the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers.*" (*Twin Peaks, supra,* 996 F.2d at p. 1379.)

---

[4] These factors were also set forth in *Polaroid Corp. v. Polarad Electronics Corp.* (2d Cir. 1961) 287 F.2d 492, 495, and thus some cases refer to the *Polaroid* factors. (*Twin Peaks, supra,* 996 F.2d at p. 1379; *Cliff Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.* (2d Cir. 1989) 886 F.2d 490, 495, fn. 3.)

■ Here, the parties' statements of facts have not set forth all facts necessary to apply the likelihood of confusion test. For example, there are insufficient facts to determine whether the parties use the same marketing channels. " 'Convergent marketing channels increase the likelihood of confusion.' [Citation.] . . . Some use of the internet for marketing does not, in itself, constitute overlapping marketing channels. [Citation.] Instead, the proper inquiry relates to 'whether both parties use the Web as a *substantial* marketing and advertising channel . . . and whether the parties' marketing channels overlap in any other way.' [Citation.]" (*Rebelution, supra*, 732 F.Supp.2d at p. 896.)

To support its position that the parties use the same marketing channels, plaintiff relies on the following facts in its separate statement: plaintiff's marketing efforts include "an extensive billboard campaign, a new interactive website, advertisements on radio and in magazines, and widespread distribution of brochures"; the "Winchester Mystery House has been publicized in local, statewide, national, and international newspapers, on local radio, in documentaries and television shows in at least seven countries, and in several magazines"; defendant announced it was producing "Haunting of Winchester House" on its Web site; and "[c]omments posted on retail websites demonstrate that confusion about sponsorship, or an endorsement or affiliation between [plaintiff] and the Movie has actually occurred." Plaintiff has also pointed out in its reply brief that it marketed and distributed its goods and services under its marks on the Internet and defendant marketed and distributed its film on several Web sites on the Internet. However, this record does not allow us to determine the extent of the parties' marketing and advertising on the Internet, that is, whether " 'both parties use the Web as a *substantial* marketing and advertising channel . . . and whether the parties' marketing channels overlap in any other way.' " (*Rebelution, supra*, 732 F.Supp.2d at p. 896.) Since application of the likelihood of confusion test would require this court to consider new factual questions and plaintiff failed to raise this issue before the trial court, the issue has been forfeited.

Thus, we conclude that the trial court properly granted summary adjudication as to the trademark and unfair competition causes of action.[5]

---

[5] Given this conclusion, we need not address defendant's argument that it prevails under the transformative use test which *Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387 [106 Cal.Rptr.2d 126, 21 P.3d 797] developed to reconcile a defendant's First Amendment rights and a plaintiff's right of publicity. (See *Winter v. DC Comics* (2003) 30 Cal.4th 881 [134 Cal.Rptr.2d 634, 69 P.3d 473].)

### C. Causes of Action for Tortious Interference with Contract and Prospective Economic Advantage

Regarding its interference claims, plaintiff contends that there were triable issues of material fact and that defendant was not entitled to judgment as a matter of law.

In order to state a cause of action for intentional interference with contract, a plaintiff must show: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587]; see *Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1603 [92 Cal.Rptr.3d 422].)

The elements of a claim of interference with economic advantage and prospective economic advantage are: " ' "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." [Citations.]' [Citation.]" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153 [131 Cal.Rptr.2d 29, 63 P.3d 937].) A plaintiff must also show that the defendant's conduct was independently unlawful, that is, "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Id.* at p. 1159.) Moreover, "the tort of intentional interference with prospective economic advantage does not require a plaintiff to plead that the defendant acted with the specific intent, or purpose, of disrupting the plaintiff's prospective economic advantage. Instead, to satisfy the intent requirement for this tort, it is sufficient to plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action." (*Id.* at p. 1153.)

Here, plaintiff submitted evidence of its contract with IDW, thereby satisfying the first element of these causes of action. Relying on its correspondence to defendant, plaintiff next argues that it produced sufficient evidence to give rise to a triable issue of fact as to defendant's knowledge of plaintiff's contract with IDW and defendant's intentional acts to disrupt the contractual relationship or plaintiff's economic relationship with IDW. We disagree.

In response to defendant's request to film at plaintiff's location, plaintiff sent an e-mail on June 2, 2009, stating: "Thank you for your interest in the

beautiful, but bizarre Winchester Mystery House. The Winchester Mystery House just signed a contract with another company for the exclusive rights to the Winchester story. I am unable to give further details at this time." This e-mail did not identify the production company, describe the terms, or indicate that the contract related to the use of any trademarks. It also did not indicate the type of production company or whether the contract related to the production of a feature film, a documentary, a cartoon, a commercial, an in-house video or audio tour, a novel, or a television show. Based on this information, defendant could not have determined that producing and distributing its film would interfere with plaintiff's contractual obligation to provide exclusive story rights to an unidentified third party.

Plaintiff also relies on its cease-and-desist letters, claiming that defendant made its decision to proceed with the distribution of its film "knowing that its actions were substantially certain to disrupt [plaintiff's] commercial relationship with IDW . . . ." On July 31, 2009, plaintiff sent a letter to defendant stating that its use of "Winchester House" in the title and the images of a Victorian structure infringed upon "marks held and used by Winchester LLC in connection with goods and services related to movies, videos, and the production of movies and videos featuring the Winchester Mystery House history and grounds." Plaintiff did not mention either a contract with a third party or identify an economic or prospective economic relationship between plaintiff and a third party. On September 4, 2009, plaintiff sent a second letter, stating that it objected to any unauthorized use of images or footage of the Winchester Mystery House in defendant's film. Plaintiff also stated: "Winchester has previously granted filming rights of the Winchester Mystery House property to other production companies. Unlike [defendant], other movie, television, and video production companies have recognized and respected the rights of Winchester to regulate the filming of images of the Winchester Mystery House property as necessary for the protection of a proprietary and valuable business asset. [¶] Please confirm that the Movie will not contain any film or video footage of the Winchester Mystery House. If filmed scenes of the Winchester Mystery House or its grounds are included in the Movie, please provide me with information on how such footage was obtained in order to confirm its authorized or exempt source." This letter focused on plaintiff's concern that defendant not use any actual footage of plaintiff's property in the film. Since the cease-and-desist letters did not refer to any contractual or other economic relationship between plaintiff and any third party, this evidence does not establish either the knowledge or intent elements of the interference claims, that is, that defendant was aware of plaintiff's commercial relationships with either IDW or any other third party and that distribution of its film would disrupt these relationships. Thus, the trial court properly granted summary adjudication as to the interference

causes of action, because the evidence would not allow a reasonable trier of fact to find in favor of plaintiff as to these causes of action.

## IV. Disposition

The judgment is affirmed.

Premo, Acting P. J., and Elia, J., concurred.